## DUTCH MAID BAKERIES, INC. v. SCHLEICHER ET UX.

(No. 2199; December 1, 1942; 131 Pac. (2d) 630)

376

For the appellant, there was a brief and an oral argument by *John U. Loomis* of Cheyenne.

For the respondents, there was a brief and an oral argument by *Walter Q. Phelan* of Cheyenne.

KIMBALL, Justice.

This is an appeal by plaintiff, Dutch Maid Bakeries, a corporation, from a judgment in favor of defendants, Harry C. Schleicher and Mary, his wife, in an action for injunction to prevent defendants from manufacturing and dealing in bakery goods in the City of Cheyenne during the period that will end December 31, 1943.

That a promise not to engage in such business in Cheyenne during that period was made and broken by defendants is admitted. Recitals in the judgment indicate that relief was denied because the trial judge believed that plaintiff's conduct in the transaction of which the promise was a part had been unfair and unjust. The question to be considered is whether there was substantial evidence to support the judgment on that ground.

The persons and corporations who were the principal actors in the transactions described in the evidence are the Dutch Maid Bakeries, plaintiff; Harry C. Schleicher, the active defendant; Wigwam Bakeries, Inc.; Oscar J. Whitlock; Omar Inc., (formerly National Baking Co.) ; and William J. Coad, Sr. They will be called, respectively, Dutch Maid (or plaintiff), defendant, Wigwam, Whitlock, Omar, Coad.

Pursuant to oral arrangements made in the latter part of November, 1937, Dutch Maid was organized by defendant and Omar for the purpose of taking over bakeries previously owned and operated by defendant and Wigwam. Defendant's bakeries were in Cheyenne, Wyoming, and Scottsbluff, Nebraska; Wigwam's in Cheyenne and Torrington, Wyoming, and Sterling, Colorado. Defendant is a man of middle age, a trained and experienced baker, engaged in that occupation since he was 12 years old. Wigwam is a one-man corporation owned and controlled by Whitlock. Defendant has owned or managed bakeries in Cheyenne off and on

since 1929. In 1936 he sold his Cheyenne bakery to Wigwam and agreed not to compete with the buyer, but in June or July, 1937, he reentered the business in Cheyenne after paying Wigwam $5000 for a release from his agreement not to do so, and from then until December, 1937, defendant and Wigwam were competitors in the business at Cheyenne.

Omar, a corporation controlled by Coad, was engaged in the flour-milling and bakery business. Coad, its president, when asked whether he and his family controlled the corporation, refused to answer, and gave no reason for the refusal. It is clear, however, that he did control Omar in all its dealings with Dutch Maid, Wigwam and defendant. It is also clear, as will appear presently, that he controlled Dutch Maid in its dealings with Omar and defendant.

Omar and Coad had offices in Omaha, Nebraska. Coad was a man of large business interests, and in acting for Omar and Dutch Maid had the assistance of one or more of a corps of six or eight employees whom he referred to as "our men" or "my staff." In stating the facts below it does not seem necessary or important always to show whether an act was done by Coad personally or was done for him by his staff.

Both defendant and Whitlock had done business with Omar by whom at one time defendant had been employed. The business relations of defendant and Coad were close and friendly to the extent that apparently defendant felt free to ask, and Coad to give, advice in regard to defendant's business affairs.

In November, 1937, Whitlock and defendant went to Omaha to see Coad about borrowing money to put through a deal between Wigwam and defendant. Coad refused to make the loan, but told defendant that "we (meaning Omar) would be willing to buy an interest" in the bakeries of Wigwam and defendant and to that end suggested a procedure that would include these

transactions: The organization of Dutch Maid as a Wyoming corporation in which Omar would own 51 per cent. and defendant 49 per cent. of the capital stock. The transfer by defendant of his bakeries at Cheyenne and Scottsbluff to Dutch Maid in exchange for shares of its stock. The purchase by Dutch Maid of the Wigwam bakeries at Cheyenne, Torrington and Sterling with money to be paid Dutch Maid by Omar for shares of stock. The operation of the bakeries by Dutch Maid with defendant as manager on a salary of $100 a week. Though defendant testified that preliminary, oral negotiations included other promises on behalf of Omar, he admitted that he agreed to the main terms of the deal proposed by Coad as stated above. Steps to put the deal through were taken under the guidance of Coad and his staff acting at first for Omar, and later, after Dutch Maid was organized, for both Omar and Dutch Maid. They prepared all writings including contracts, corporate by-laws and minutes.

By December 10, 1937, the terms of contracts for transfer of Wigwam's and defendant's bakeries to Dutch Maid had been settled orally, and the sellers had surrendered possession of the properties to Omar and defendant as promoters and organizers of Dutch Maid, in whose behalf business was being carried on, with defendant as manager.

Some time before December 20, 1937, articles of incorporation and proposed by-laws for Dutch Maid were prepared by Coad's staff. The articles of incorporation filed December 21, 1937, provided for a board of three directors given power, among other things, to enact by-laws. Defendant was named as one of the directors for the first year. The two others, selected by Coad to represent Omar, were dummies who made no pretense of exercising independent judgment but always followed instructions of Coad and his staff.

When the proposed by-laws were submitted to de-

fendant for examination, he objected to sections which provided that: "All officers, as well as all agents and employees of the corporation, shall be removable by the directors without notice and with or without cause," and that: "Any officer may be removed at any time by a majority vote of the entire membership of the board." Three or four of Coad's staff came to Cheyenne to confer about this and other objections to the by-laws. At the conference, on December 20, defendant's objection to the removal provisions (as stated in the testimony of one of the staff) was that "the other two directors had a suzerainty over his term of office." Defendant insisted that the other two directors should not have power to discharge him without giving him notice and an opportunity to be heard. His testimony indicates that the conference broke up without a definite understanding on the matter. Members of the staff testified that they positively refused to agree to any change to meet defendant's objection.

January 3, 1938, the final contract for the purchase of the Wigwam bakers was put in writing signed by Wigwam, Whitlock, Dutch Maid and defendant. The stated purchase price was $92,800, of which $23,400 was paid to Wigwam by Omar in cash; $13,300 was retained for Omar in satisfaction of a debt of Wigwam to Omar; $36,100 was promised to be paid by Dutch Maid to miscellaneous other creditors of Wigwam, and $20,000 was evidenced by Dutch Maid's promissory note, payable to Wigwam and secured by chattel mortgages. Figures are in round numbers and only approximate. Wigwam and Whitlock promised not to compete with Dutch Maid in territory served by its bakeries, and Dutch Maid and defendant made similar promises not to compete with bakeries of Wigwam in Casper, Sheridan and Riverton, Wyoming.

January 7, 1938, the first meeting of the board of directors of Dutch Maid, was held at Omaha. Defend-

ant was not present, but he had signed a waiver of notice of the time, place and purpose of the meeting, and the last page of the minutes carries his signature below the word "approved." The minutes show the adoption of the corporate by-laws with no change in the removal provisions to which defendant had objected on December 20. Defendant was elected president, without mention of salary.

There were no writings to show the respective interests of defendant and Omar in the new corporation until after business in its behalf had been carried on for more than three months.

On March 19, 1938, the contract for transfer of defendant's bakeries at Cheyenne and Scottsbluff to Dutch Maid was put in a writing, headed "bill of sale and agreement." The writing shows that Dutch Maid took over the business, including physical property, accounts receivable and good will, "as of December 10, 1937." The recited consideration was $29,763 to be paid in the following way: $70 in cash; $6,700 by issue to defendant of 67 shares of the capital stock of Dutch Maid of the par value of $100 per share, and $22,993 by Dutch Maid agreeing to pay that amount in satisfaction of debts of the business when taken over.

This writing contains the covenant that is the basis of the action for injunction. The covenant, somewhat abbreviated, is that defendants will not, directly or indirectly, manufacture or deal in bakery goods in competition with Dutch Maid for a period of five years after January 1, 1938, in Cheyenne or Scottsbluff or within their trade territories. It is recited that "this restrictive agreement shall be considered as an inducement of this bill of sale and agreement."

The oral contract of employment of defendant as manager was never put in writing, but the minutes of a directors' meeting held March 19, 1938, show that "until further action of the board" his salary was fixed

at $100 a week, and payment thereof "since the commencement of business of the corporation" (about December 10, 1937) was ratified. Omar, though it was extensively engaged in the bakery business, was not asked to agree not to compete with Dutch Maid.

The directors, at the meeting of March 19, also authorized the stock issue, 519½ shares. Defendant received 67 shares as the consideration for the business he had turned over to the corporation. Omar received the rest, 452½ shares, for which it paid in the following manner: $23,300 to Wigwam; $13,300 retained by Omar in satisfaction of a debt due it from Wigwam, and about $8,000, cash paid into the treasury of Dutch Maid. The $8,000 in cash, a few days after it was received, was paid out on debts contracted by Wigwam and assumed by Dutch Maid.

Omar then transferred to defendant 187½ shares for which defendant gave his promissory note for $18,750 and deposited as collateral security all his available assets: 254½ shares (49%) of the capital stock of Dutch Maid and a few shares of the stock of a local furniture company. After this transaction Omar owned 265 shares (51%) of the capital stock of Dutch Maid and held the rest (49%) as security for a note that defendant could not hope to pay except from profits earned by the corporation.

From the beginning, Dutch Maid lost money at the rate of about $2000 a month, and by September, 1938, Coad had decided to salvage what he could for the benefit of Omar. He summoned defendant to Omaha for a conference in which Coad made it known that he had decided that defendant or Omar would have to take over the interest of the other. There was no discussion of the value of the respective interests of the parties, and no mention of the possibility of a sale of both interests to a third party. Coad's first proposal (probably in the circumstances a mere gesture) was that

defendant buy the interest of Omar. When this was dismissed as impossible, Coad suggested that the best thing for defendant to do was to turn over his stock to Omar and take back his $18,750 note. The mentioned alternative was that "naturally we (meaning Omar) would have to foreclose on the stock," which included defendant's stock in the furniture company as well as his stock in Dutch Maid. The final outcome of the conference was that defendant transferred to Omar all his shares of stock in Dutch Maid, and received back his note and shares of stock in the furniture company. He resigned as director and president of Dutch Maid and his salary as manager was reduced to $75 per week.

After Coad had thus acquired for Omar defendant's interest in the bakeries, he immediately tried to find a purchaser for the property, and by negotiations concluded about December 2, 1938, he sold to Wigwam all of Dutch Maid's outstanding capital stock. There was evidence indicating that by this sale, Omar was able to save about 50 per cent of its investment.

Defendant had no notice of the sale to Wigwam until the morning of December 5, when he was told by Whitlock that he had taken over the bakeries and "you are out." This was confirmed from Omaha by a member of the staff to whom defendant talked by telephone, and later by a written notice dated December 7, reciting that the defendant's discharge had become effective as of the opening of business on December 5. No reason for defendant's discharge was given at the time, except that his services were no longer required, and no reason appears from the evidence in the case, except that the discharge resulted from the transfer of the capital stock of Dutch Maid to Wigwam. Defendant, from December, 1938 to July, 1939, tried unsuccessfully to find work, and then, about July 11, 1939, opened in Cheyenne the bakery that Dutch Maid, as plaintiff in the action, seeks to close by injunction.

A bargain is in restraint of trade when its performance would limit competition in any business or restrict a promisor in the exercise of a gainful occupation, and the bargain is illegal if the restraint is unreasonable. Restatement of Contracts, §§ 513, 514. A bare contract not to compete is invalid. Williston on Contracts, §§ 1635, 1636; Carpenter in 76 U. of Pa. Law Rev., 244, 254. A promise to refrain from competing will not be enforced unless it is ancillary to the main purpose of a lawful contract. Restatement of Contracts § 515 (e) ; United States v. Addyston etc. Co., 85 Fed. 271, 282. "In short, it is never the covenant itself, but the covenant in relation to the facts of the situation or contract to which it is incidental, which may be valid." Super Maid Cook-ware Co. v. Hamil, 50 Fed. (2d) 830. The most common examples of reasonable restraints are those arising from promises ancillary either to the transfer of the good will of a business, or to a contract of employment. Restatement of Contracts, §§ 515 (e), 516 (a) (f).

Defendant's promise was ancillary to a transaction that may be viewed as a joint business venture in the nature of a copartnership though the business was to be carried on through the medium of a corporation. See Anchor Electric Co. v. Hawkes, 171 Mass. 101, 108, 50 N. E. 509, 511; Caldwell v. Roach, 44 Wyo. 319, 334, 12 P. (2d) 376, 381. The parties to the venture were defendant and Omar. Defendant contributed his bakeries and Omar in effect contributed the Wigwam bakeries. Dutch Maid was the instrumentality to take over the bakeries and to carry on the business with defendant as manager. It could hardly be said that the parties to the venture were dealing at arm's length. There was a fiduciary relation in the nature of a joint adventure. See Wyoming-Indiana Oil & Gas Co. v. Weston, 43 Wyo. 526, 543, 7 P. (2d) 206, 211. That relation did not terminate when the business was put in the hands

of Dutch Maid, the instrumentality chosen to carry on the venture under the control of Omar acting through Coad and the dummy directors. See Arnold v. Maxwell, 223 Mass. 47, 111 N. E. 687; Silversmith v. Sydeman, 305 Mass. 65, 68, 25 N. E. (2d) 215, 217; Modlin v. Licht, 231 N. Y. Supp. 265, aff'd. 170 N. E. 154; Bogert on Trusts, § 16, pp. 59, 62.

Besides, the trial judge may reasonably have believed that Coad was the dominant party throughout, and much better prepared than defendant to comprehend the import of arrangements that gave him power to deprive defendant of all interests in the business on the eve of its liquidation for the benefit of Omar by transfer of the corporate stock to Wigwam to whom defendant, a year and a half before, had paid $5000 for the right to engage in the bakery business in Cheyenne.

A court, in granting or refusing an injunction to require a promisor to refrain from competition, exercises a discretion controlled by the same equitable principles that apply in an action for specific performance. High on Injunctions, (4th ed.) § 1134; Pomeroy on Eq. Jurisprudence, § 1341; cases cited below.

Equity will not assist a party seeking to enforce a hard bargain. The right to specific performance depends upon circumstances and conditions in addition to the existence of a valid contract. The contract must be perfectly fair in all its parts, and free from misrepresentation or misapprehension. Specific performance will be refused when it appears that the plaintiff's conduct in obtaining the contract, or in acting under it, has been unjust and unfair. Though the contract be free from fraud, mistake or other feature that would authorize a court to set it aside, equitable relief may be denied if plaintiff obtained it by taking undue advantage of his position, or if in acting under it he has resorted to unfair conduct. These are expressions com-

monly used in elaboration of the maxim: "He who comes into equity must come with clean hands." See Pomeroy on Specific Performance (3d ed.) §§ 38, 40; on Equity Jurisprudence, § 400.

When the promise not to compete is ancillary to an employment contract, injunction to enforce the promise will not be granted "unless the whole matter appears equitable; that is, unless it rests on a contract which is fair on its face, involves no imposition or injustice, and the interests of the employer in the subject-matter of the contract to which the restrictive covenant is incidental requires in good faith for its protection the enforcement of the covenant." Super Maid Cook-ware Corp. v. Hamil, 50 Fed. (2d) 830. And though the employment contract may be terminated at the will of either party to it, an injunction to enforce the ancillary promise of the employee not to compete with the employer may be denied on the ground that the conduct of the employer in discharging the employee without just or adequate cause is "savored with injustice." Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 195 N. E. 747. See, Public Laundries v. Taylor, (Tex. Civ. App.) 26 S. W. (2d) 1085; Chicago Towel Co. v. Reynolds, 108 W. Va. 615, 152 S. E. 200; Granger v. Craven, 159 Minn. 296, 304, 199 N. W. 10, 14, 52 A. L. R. 1356, 1362. In other cases where injunction was refused, the promise not to compete was ancillary to a transaction that included, as in the case at bar, both the sale of property and a contract of employment. Fries v. Parr, 139 N. Y. Supp. 220; John J. Stanley Co. v. Lagomarsino, 49 Fed. (2d) 702; Carpenter v. Southern Properties, (Tex. Civ. App.) 299 S. W. 440; Smith Baking Co. v. Behrens, 125 Neb. 718, 251 N. W. 826.

In considering the conduct of Dutch Maid, for the purpose of determining its standing in equity as a petitioner seeking specific performance, the acts of Coad

cannot be distinguished from those of the plaintiff corporation. Though Coad was not an officer of plaintiff, he assumed and exercised a control that made him for all practical purposes the corporation itself. See Allied Chem. & Dye Corp. v. Steel & Tube Co., 14 Del. Ch. 1, 12-13, 120 Atl. 486, 491, and cases cited. He also represented Omar, the majority stockholder of plaintiff. In the discharge of defendant on December 5, 1938, he seems to have assumed the further duty of representing Wigwam. In acting in these various capacities, it was perhaps natural that his predominant motive was to advance the interests of Omar, and that he overlooked the duty of fair treatment owed by Omar and Dutch Maid to defendant.

Defendant's actual property interest in Dutch Maid was by ownership of 67 shares of stock for which he gave full value by turning over to the corporation substantially all the property he had. He received the stock, March 19, 1938, and it was immediately put in jeopardy by being pledged, with 187½ additional shares sold to him by Omar, to secure a note for $18,750. This purchase of additional shares by defendant was, under circumstances known to Coad, delusive. About six months later, Coad had decided, as the court may have believed, that the business venture was definitely a failure and should be terminated, and it probably did not occur to him that he was pressing a hard bargain for the benefit of Omar when he prevented defendant from sharing in the salvage of the venture by insisting, and inducing defendant to concede, that the $6700 he had contributed was forfeited to Omar on his failure to contribute $18,750 more.

The trial judge had a right to believe that the employment of defendant as manager of the bakeries taken over by Dutch Maid was a material part of the consideration for his promise not to compete. See Weidman v. United Cigar Stores Co., 223 Pa. 160, 72 Atl.

377. It was admitted that his employment was promised by Coad before the venture was launched, but the only evidence of an agreement in regard to his duties and authority is the testimony of defendant to the effect that he was to "run the bakeries" without interference except on matters that would involve considerable expense. He was not permitted to do this. The trial judge found that plaintiff, acting through Coad and his staff, constantly interfered with defendant in his management of the business so as to make it most difficult for defendant to run the business successfully. We need make but brief reference to evidence in support of the finding. It was known that Coad dictated the contents and size of the loaves of bread, and ordered that baking for all the bakeries should be done at one place. A serious interference, that does not seem to be denied, was the requirement that Dutch Maid buy all its flour of Omar, paying $6.50 a barrel, though defendant could have obtained better flour on the market for $4.50 a barrel. This last requirement must have caused a substantial loss to Dutch Maid, and a profit to Omar.

The trial judge found, also, that the plaintiff, without cause or hearing, wrongfully terminated defendant's employment as manager, and we think this finding is supported by the evidence.

It is argued here that defendant's discharge was justified by the fact that the business lost a good deal of money while defendant was manager. But it was not shown that Coad thought or asserted that defendant did not faithfully discharge the duties of manager in so far as he was permitted to act in that capacity. He was not charged with mismanagement, and it apparently did not occur to Coad that any other manager could make the business prosper. After the sale of the stock to Wigwam the Cheyenne bakery under the management of Whitlock, the new manager, lost at the rate of

about $44 a day for the period, January 1, 1939 to July 1, 1939. Under defendant, its loss was about $10 a day.

It is contended, however, that defendant's discharge without cause or hearing was justified by the terms of the employment contract. It is true that if that contract stood alone as a promise of Dutch Maid to employ and of defendant to serve for an indefinite time, it could have been terminated by either party at any time with or without cause. See Casper National Bank v. Curry, 51 Wyo. 284, 296, 297, 65 P. (2d) 1116; Restatement of Agency, § 442. But in view of the fact that it was a part of a transaction that included the giving up of a business and an investment in the new business by the person to be employed, it would be unreasonable to suppose that it was intended that the employer had the right at any time to terminate the employment without cause. See Restatement of Agency, § 442, comment (a) and (c) ; Carnig v. Carr, 167 Mass. 544, 46 N. E. 117, 35 L. R. A. 512, 57 Am. St. Rep. 488; Weidman v. United Cigar Stores Co., 223 Pa. 160, 72 Atl. 377; Seifert v. Arnold Bros., 138 Cal. App. 324, 31 P. (2d) 1059; Littell v. Evening Star Newspaper Co., 73 App. D. C. 409, 120 F. (2d) 36.

When the defendant, on December 20, 1937, insisted that he should not be discharged except for cause and after a hearing, and objected to the proposed by-laws providing that the two directors controlled by Coad could discharge him without cause or notice, it would seem that he was in effect asking for no more than a promise of fair treatment. His request, however, was positively and definitely refused when the by-laws were adopted as proposed. It is contended that defendant agreed to the by-laws by approving the minutes of the meeting at which they were adopted. We do not think this circumstance can have much weight on the question we are considering. After the by-laws had been adopted by the dummy directors, there was reason to

suppose that further objection would be futile. If it be conceded that the adoption of the by-laws made the employment contract terminable at will, the court nevertheless may reasonably have believed that its termination without cause was inequitable. See Economy Grocery Stores Co. v. McMenamy, 290 Mass. 549, 195 N. E. 747; Jewel Tea Co. v. Wilson, 20 Ohio C. C. (N. S.) 233; Iron City Laundry Co. v. Leyton, 55 Pa. Super. Ct. 93.

We hold that there was evidence to justify a finding that plaintiff's conduct in the transactions reviewed above was, in the mild language of one of the cited cases, "savored with injustice," and that the judgment denying an injunction should be affirmed.

*Affirmed.*

RINER, Ch. J., and BLUME, J., concur.