394 P.2d 283

Claire DRONG, individually, surviving wife of Frank Drong, deceased, and the community composed of them during his lifetime, and as the duly appointed, qualified and acting executrix of the will and estate of Frank Drong, Deceased, and Credit Adjustment Agency, Inc., a corporation, Plaintiffs-Appellants,

v.

Laverne A. COULTHARD (also known as L. A. Coulthard), Defendant-Respondent.

No. 9419.

Supreme Court of Idaho.

July 22. 1964.

Ware, Stellmon & O'Connell, Lewiston, for appellants.

Daniel A. Quinlan and D. K. Worden, Jr., Lewiston, for respondent.

KNUDSON, Chief Justice.

Prior to and on June 1, 1949, appellant, Claire Drong, and her husband, Frank Drong, now deceased, were the owners of, and engaged in, a collection and credit re-

porting business in Nez Perce and Clearwater Counties, Idaho and Asotin County, Washington. Under date of June 1, 1949, respondent, LaVerne A. Coulthard, entered into a contract of employment with Frank Drong, which contract was in writing and executed by Frank Drong as "first party" and respondent as "second party," which contract provides, *inter alia* as follows:

> "As a part of the consideration for this contract of employment and the compensation to be paid, second party hereby expressly undertakes and agrees that, for a term of five (5) years after termination of this agreement, he will not, either individually, as a partner, or as a shareholder of any corporation, or otherwise, accept any employment or perform any services whatsoever in competition with the business carried on by first party at the time of such termination, or any business incidental thereto, in the Counties where first party is doing business as above mentioned."

Appellant and her husband, Frank Drong, continued to own and operate the business until July 1, 1957, at which time it was transferred to the Credit Adjustment Agency, Inc., a corporation organized by Mr. and Mrs. Drong. Following such transfer respondent continued as collection manager for the corporation, performing the same duties as before. Frank Drong died January 13, 1962.

On March 3, 1962, respondent terminated his employment and immediately thereafter established a collection agency business and commenced carrying on such business in Nez Perce and Clearwater Counties, Idaho, in competition with the business owned and operated in said counties by appellants.

On May 18, 1962, appellants commenced this action, seeking to restrain and enjoin respondent from engaging in any business or performing any services in any business in competition with the general credit reporting and collecting agency business carried on by appellants for the period of five years after March 3, 1962, and within the counties hereinbefore mentioned.

The trial court entered its decree denying appellants the relief sought and this appeal is from such decree entered August 19, 1963.

In view of the grounds stated by the trial court as to the reason for denying relief to appellants, we shall first consider the allegations contained in appellants' first assignment of error to the effect that the decree is not supported by any competent or pertinent pleadings or evidence, and is contrary to the evidence. During our consideration of this assignment of error we shall assume that the original contract upon which appellants base this action is a valid contract.

The following quoted findings of fact and conclusions of law disclose the trial court's reason for denying relief to appellants:

"* * * that subsequent to June 1, 1949, and on many occasions thereafter the said Frank Drong promised the defendant that he, the defendant, in the event of a sale of said business would be given the first opportunity to purchase said business, and that in reliance on said promise the defendant continued his employment with the said Frank Drong; that these promises of the said Frang Drong were made for the express purpose of inducing the defendant to stay with the firm, and, as a matter of fact, did induce him to stay.

    *       *       *       *       *       *

"IV.

"That it is difficult to determine whether or not the defendant at the time he left the employment was operating under the original contract or not; that in any event, whether the contract was still in force or not, the contract was modified in one important consideration—that the defendant was induced to remain with the plaintiff corporation and Claire Drong by promises that eventually he would be able to obtain an interest in or own the business; that these promises were a method Frank Drong used to induce his help to stay with him; that such in-

ducements were made, not only to the defendant, but independently to others also in the employment of the plaintiffs.

"V.

"That during the course of the defendant's employment, at various times, the said plaintiffs, Frank, and Claire Drong, entered into negotiations with others to sell said business, all of which was kept sup—ressed and concealed from the defendant for the purpose of inducing the defendant to remain in the employment of the plaintiffs; that subsequent to the death of Frank Drong, Claire Drong, without any consideration given to the defendant, agreed to sell the business to one, George Klein; that when the defendant learned of the sale to George Klein, he made arrangements with Klein for the purchase of an interest in the business; that when Mrs. Drong found out that the defendant was purchasing an interest in the business from Klein she returned to Klein the down payment he had made and called the deal off. That defendant then approached plaintiff, Claire Drong, and inquired of plaintiff as to her intentions toward defendant as regards the ultimate purchase of the business, but, that plaintiff, Claire Drong, refused to tell defendant if she would ever sell the business to him,

"VI.

"That the right to purchase in the defendant was a modification of the terms of the contract, if the contract had not already been terminated by the acts of the parties, and the real breach occurred on the part of Mrs. Drong, and, by such action, the defendant is relieved of his responsibility to refrain from competing with her in this community.

"CONCLUSIONS OF LAW

"That the conduct of Frank Drong and Claire Drong and the Creidt Adjustment Agency, Inc., as aforesaid, in promising the defendant the first opportunity to purchase the business, and inducing the defendant to remain at his position, and in breaking said promise by virtue of negotiations for the sale of said business with another, and in refusing to honor said promises, was oppressive, unjust, unconscionable and inequitable, and the plaintiffs are not entitled to the equitable relief sought or to any relief, and the defendant is relieved of his re_ponsibility to refrain from competing with Claire Drong and the Credit Adjustment Agency, Inc., in this area."

There is no merit to the assertion in appellants' first assignment of error that the decree is not supported by any competent or pertinent pleading. Respondent very specifically and fully alleged by way of a separate and affirmative defense the very facts which the court found and set forth in the findings of fact and conclusions of law as controlling in this case.

Respondent also alleged in his affirmative defense, and supported by testimony, that on or about June 1, 1951, Frank Drong called respondent into his office and informed him that the employment agreement of June 1, 1949, was terminated. In connection with respondent's allegation and testimony in this regard, it should be pointed out that the contract of employment specified a certain salary to be paid respondent, for his services, during each of four consecutive six-month periods following the commencement of his employment. The contract does not specify what salary shall be paid after the fourth six-month period, but it does provide that "thereafter a new agreement for salary shall be agreed upon by and between the parties."

Although the court did not determine if the original contract continued in force it did find that such contract had been modified by promises made to respondent that eventually he would, if he remained in appellants' employment, be able to obtain an interest in or own the business and that he would have the first opportunity to purchase the same; that respondent was thereby induced to remain as an employee; that

appellants' breach of and refusal to honor such promises was unjust, unconscionable and inequitable. The salient issue to be resolved on this appeal is whether the evidence is sufficient to sustain such findings.

Although no attempt will be made to quote or discuss all of the testimony supporting or relating to respondent's allegation of promises and inducements made to him by Mr. Drong, the following quoted testimony is pertinent.

Respondent had testified that in August or September, 1951, a Mr. Souliere, who had been employed by appellants as collection manager, terminated his employment and thereupon respondent was offered the position of collection manager, at some increase in pay. Referring to that time, respondent was asked:

"Q Now at the time that you—that Mr. Souliere left and you took over the duties that Mr. Souliere had formerly had, did you have any conversation with Frank Drong concerning your future with the Credit Adjustment Agency?"

to which question respondent replied "Yes," and in reply to an interrogation as to what Mr. Drong said to him, respondent stated:

"A Well, Mr. Drong told me at that time that there was a great opportunity there for me if I could handle this work, build the business up and so forth, that he wouldn't be there forever and that it would pass on to someone and if I handled the job satisfactorily to him, when he was ready to retire or sell out, that I would have first chance to purchase the business, that I would be the number one person in line to inherit the purchase of that business depending—if I could meet his requirements as collection manager and conduct myself properly at all times."

\* \* \* \* \* \*

"Q Were there any other times after the time that Mr. Souliere quit or left the place that you and Mr. Drong ever had any discussions concerning your opportunity to buy into the business? "A Yes, through the years I was reminded many times of my opportunities."

\* \* \* \* \* \*

"Q Mr. Coulthard, did Mr. Drong ever tell you at any time during the course of your employment that you were not proving out and you were not going to get the opportunity to buy the business?

"A No sir."

"Q Mr. Coulthard, did you up until sometime in the latter part of 1961 have any reason to think that Mr. Drong was not going to honor this promise he had made to you?

"A No, I did not. I mean Frank said nothing to me of that nature at any time."

In corroboration of respondent's said testimony, a witness, Mr. Knisely, who had been employed by appellants during August, 1954, and worked for approximately three and a half years, testified concerning a conversation he had with Mr. Frank Drong one night while working late, as follows:

"A * * * Frank was out in my office and mentioned the fact that he didn't intend to stay in the business for the rest of his life and that what he would like to do is have me get my wife down there and see if she could work into the business, that Vern did have his wife interested, she could handle that type of work, and that—but what he would like to do when he left is turn it over to possibly two men and their wives rather than just one man and let us run the business together more or less. He didn't actually say you can buy the business or any such thing. He said he would like to turn it over to two men and their wives.

"Q What two men was he talking about, if you know?

"A: He was talking about Vern Coulthard and his wife and I and my wife. He said that Vern had his wife interested in it and he wished that I would get mine interested in it."

Said witness testified relative to a conversation he had with appellant Claire Drong approximately eight months after he went to work for appellant Agency, and quoting her stated:

"A * * * She said, well, you can never tell, Frank's health isn't too good and he may decide to leave here in not too awfully long in the future and if he does, of course, Vern will have first chance but as well as you and Vern get along together and as well as you work together, there is always a possibility that you might also be included in on any arrangement that will be made."

Another employee of appellants, Mr. McVicars, testified regarding a conversation he had with Mr. Drong during the middle of May, 1960, as follows:

"A Well, Mr. Drong made the statement at that time that—he said that I don't plan on working more than six or seven more years and that at that time he would retire and that the business would be sold to the men who were working for him at the time that he did retire."

The testimony of a Mr. Kuyper, also a former employee of appellant Agency, is to the effect that during his negotiations with Mr. Drong concerning his possible employment by appellant Agency, he, Mr. Kuyper, was told that there would be a

possibility of his buying into the Agency; that being able to buy into the company was an incentive to him to terminate his employment in Portland and come to the Agency in Lewiston. Such testimony would justify the trier of fact in concluding that Mr. Drong made to others promises similar to what respondent claims were made to him, as a means of inducing them to become employees of the Agency.

There is nothing in the record to indicate that respondent, during his entire period of employment, did not perform his duties entirely satisfactorily and faithfully. The undisputed evidence discloses that respondent remained at his work an exceptional number of hours during many days; that he was left in charge of the business during the absence of Mr. Drong for periods of weeks at a time. The record also shows that Mr. Drong named respondent as an executor in his last will, executed in 1955. Appellant Claire Drong testified that respondent satisfactorily handled his work as manager; that he did his work well and in his capacity was a good man and that she had confidence in him.

The original contract does not specify a definite term or period during which respondent shall be employed nor does it provide for the length of its duration other than the following quoted paragraph:

"It is further agreed between the parties hereto that this agreement may be terminated upon two (2) weeks notice, given by either of the parties hereto to the other, or in such shorter time as may be agreed upon."

The record discloses that respondent remained in the employ of the appellants for a period of nearly thirteen years. When respondent was asked, "Mr. Coulthard, would you have stayed with the Credit Bureau these number of years had you known that you were not going to get the chance to buy it?" his reply was, "No, sir."

It is undisputed that during the spring of 1958, after considerable negotiations, Mr. and Mrs. Drong entered into a contract to sell the appellant agency to one George Klein; that such sale was not consummated only by reason of difficulties which arose concerning the Internal Revenue Department. No mention was ever made to respondent regarding the negotiations leading up to said sale. In fact, respondent testified that neither Mr. nor Mrs. Drong, at any time, ever told him that they were making any offers to sell part of the business or stock in the business to any other person.

It is likewise undisputed that subsequent to Mr. Drong's death, Mrs. Drong again negotiated directly with Mr. Klein to sell the business to him; that she commenced such negotiations on the day that her husband died; that she made no mention to respondent of such negotiations or sale until

the day before Klein was to take over the business.

Although Mrs. Drong made no mention to respondent of the negotiations with Klein, respondent and Klein entered into an agreement between themselves, a few days prior to the termination of respondent's employment, that if and when Klein's deal with Mrs. Drong was consummated he, Klein, would sell a one-third interest in the business to respondent. The following quoted testimony of Mr. Klein, relative to this sale, and what resulted, is not contradicted:

"Q  Well, as a matter of fact, you and Mr. Coulthard had a little deal yourself, did you not, worked out where that, if and when your deal went through with Mrs. Drong, then Mr. Coulthard—you were going to sell Mr. Coulthard a third, were you not?

"A  Yes, that we had an agreement that he would eventually buy a third of the business.

"Q  And of the business that you were going to buy from Mrs. Drong here in Lewiston?

"A  Right.

"Q  All right.  Now did you advance directly or indirectly to Mrs. Drong the proposition that Mr. Coulthard might possibly have an ownership interest in this business?

"A  Yes.

"Q  And what was her reaction to this?

"A  She stated that she didn't think that I wanted Vern in the business and that I would be making a mistake if I took him in the business.

"A  As a matter of fact, Mr. Klein, wasn't her attitude toward this partly the reason that you backed out?  Didn't it—did it have a bearing upon your decision to ask for your $10,000.00 back and for her to cancel the contract?

"A  Yes, it did.

"Q  It had a definite bearing, didn't it?

"A  Yes.

"Q  As a matter of fact, you were very good friends and you didn't want to jeopardize your friendship with her?

"A  No, with her or Vern either."

The following quoted testimony of respondent supports the finding of the trial court as stated in the last sentence of paragraph V of said finding, to-wit:

"A  Well, I quit because I had found that all the promises I had had through all the years and after all the hard work and compliments I had received for the fine job I was doing were meaningless, that the place was being sold out from under me without even consulting me. I went in and asked to talk to Mrs. Drong.  I did go in and talk to her

after Mr. Klein's sale had fallen through, asked her if the place of business was for sale and if it was for sale, I would like to buy, and Mrs. Drong didn't answer me at the time. I asked her if she would tell me if she wouldn't sell to me why she wouldn't sell to me. She still didn't answer me. Finally I asked her if I could just have an answer and that is all I wanted was an answer and she answered me by saying 'I intend to run this business myself for a few days, a few weeks or a few months.' I told her then that I had my answer and asked if she would release me, I wanted to be terminated, and she agreed to do this and I was terminated that day."

The foregoing quoted testimony, which is undenied, and the fact that respondent, as soon as he learned about the negotiations between Mrs. Drong and Klein following the death of Mr. Drong, sought and arranged to purchase from Klein a share or interest in the business, is strong corroborative evidence of respondent's testimony that he sincerely desired to acquire the business or an interest therein, and that he had relied upon a promise that he would be given an opportunity to buy it. No explanation is given as to why Mr. or Mrs. Drong did not at any time mention to respondent that they were considering a sale.

It is contended by respondent that if appellants had made known to respondent, even as late as in 1958, that they were not going to honor any promise that they had made to him regarding the purchase of an interest, respondent would then have had an opportunity to decide for himself whether he wanted to continue in their employment or seek opportunities elsewhere; that respondent spent the last five years in appellant's employment in reliance on a promise which appellants had decided to abrogate some five years before respondent terminated it; that such conduct is unfair, unjust and oppressive.

The language contained in paragraph VI of the findings of fact discloses that the trial court considered the action on the part of Mrs. Drong, subsequent to the death of her husband, as being particularly oppressive and unjust. The evidence is convincing that she had made a sale of the business to Klein and had accepted a $10,000.00 payment; that the principal reason Klein permitted the money to be returned to him and the contract cancelled was because Mrs. Drong expressed disapproval of Klein's selling any interest to respondent. By her action she not only violated the agreement which respondent claims existed, but evidently insisted on making it impossible for respondent to acquire an interest in that particular business from anyone else who became the owner.

■ The authorities are quite uniform in their holding concerning the legal principles involved in a case of this nature. This court has stated that where a court of equity is asked to enforce a covenant by ordering specific performance and granting an injunction to prevent a breach of it, equitable principles will prevail and the rules of fair dealing and good conscience must be applied. Smith v. Shinn, 82 Idaho 141, 350 P.2d 348.

In Economy Grocery Stores Corporation v. McMenamy (1935), 290 Mass. 549, 195 N.E. 747, the court had under consideration a like issue, and stated:

"* * * A suit in equity like the present, to enforce a negative covenant made by the defendant, is in reality a petition for specific performance. (citation) Specific performance is not a matter of strict and absolute right. A petition of that nature is addressed to the sound discretion of the court. It will not be granted if the conduct of the plaintiff is savored with injustice touching the transaction, even though there is no sufficient ground for the rescission of the contract. * * *"

In Miller v. Kraus (Cal.Dist.Ct.App., 1916), 155 P. 834, the court quoted with approval the following:

" 'Whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.' "

Also in Dutch Maid Bakeries v. Schleicher (1942), 58 Wyo. 374, 131 P.2d 630, the court considered a covenant not to compete, and pointed out that:

"A court, in granting or refusing an injunction to require a promisor to refrain from competition, exercises a discretion controlled by the same equitable principles that apply in an action for specific performance. * * *

"Equity will not assist a party seeking to enforce a hard bargain. The right to specific performance depends upon circumstances and conditions in addition to the existence of a valid contract. * * * Specific performance will be refused when it appears that the plaintiff's conduct in obtaining the contract, *or in acting under it,* has been unjust and unfair. Though the contract be free from fraud, mistake or other feature that would authorize a court to set it aside, equitable relief may be denied if plaintiff obtained it by taking undue advantage of his position, *or if in acting under it he has resorted to unfair conduct.* These are

expressions commonly used in elaboration of the maxim: 'He who comes into equity must come with clean hands.'
* * *

"When the promise not to compete is ancillary to an employment contract, injunction to enforce the promise will not be granted 'unless the whole matter appears equitable; * * *'" (emphasis supplied)

In Witthoft v. Commercial D. & I. Co., 46 Idaho 313, 268 P. 31, this court had under consideration a case involving the application of such equitable doctrine, and stated:

"* * * Gathe had done everything in his power to secure for himself or his estate the entire fruits of the contract, and deprive Witthoft of any enjoyment thereof. He cannot now come in, brushing the feathers from his mouth, and ask the court to enforce in his favor an agreement he has outraged and trampled underfoot. The maxim, 'He who comes into equity must come with clean hands,' imposes itself alike upon him who defends, and upon him who prosecutes, a suit in equity."

■ In the instant case the trial court found that Mr. Drong, on many occasions, promised respondent that in the event of a sale of the business, respondent would be given the first opportunity to purchase it; that such promises were made for the express purpose of inducing respondent to remain with the firm and did in fact induce him to stay; that the right of purchase constituted a modification of the terms of the contract. Irrespective of whether the promise referred to constituted a modification of, or was only ancillary to, the original contract, there is substantial competent evidence to sustain the court's findings and conclusions.

The trial court had opportunity to observe the witnesses, to consider and weigh their testimony and determine the credibility of each. After the court has found, the criteria are not what other or different findings the evidence could or would sustain, not what findings are plausible, not the weight or quality of the evidence or credibility of witnesses, but the sole criterion is simply whether there is substantial evidence, regardless of conflict, to sustain the findings as made, with all reasonable inferences and intendments in favor thereof. Conley v. Amalgamated Sugar Co., 74 Idaho 416, 263 P.2d 705.

■ A number of other errors are assigned by appellants, however in view of the fact that throughout the foregoing of this opinion we have assumed the written contract relied upon by appellants to be valid, and having concluded that the trial court's action in denying relief to appellants is sustained by the evidence and does not con-

**498**

stitute abuse of discretion, it is unnecessary to consider the remaining assignments.

The judgment and decree of the trial court is affirmed.

Costs to respondent.

McQUADE, McFADDEN, TAYLOR and SMITH, JJ., concur.