2012 WY 66

**Yale PRESTON, Appellant (Plaintiff),**

v.

**MARATHON OIL COMPANY and Thomas Smith, Appellees (Defendants).**

No. S–11–0166.

Supreme Court of Wyoming.

May 10, 2012.

Representing Appellant: Philip A. Nicholas and Mitchell H. Edwards, Nicholas & Tangeman, LLC, Laramie, Wyoming. Argument by Mr. Edwards.

Representing Appellees: Mark R. Ruppert, Joanna R. Vilos and Tyler J. Garrett, Holland & Hart LLP, Cheyenne, Wyoming;

Shane P. Coleman, Holland & Hart LLP, Billings, Montana. Argument by Mr. Ruppert.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1] The United States Court of Appeals for the Federal Circuit certified a question to us regarding the validity of an assignment of intellectual property rights given by Yale Preston to Marathon Oil Company without any additional consideration other than continued at-will employment.

## CERTIFIED QUESTION

[¶ 2] The certified question is:

Does continuing the employment of an existing at-will employee constitute adequate consideration to support an agreement containing an intellectual property-assignment provision?

Our answer to the question is "yes," continuation of at-will employment is sufficient consideration for an agreement requiring assignment of intellectual property.

## FACTS

[¶ 3] The certification order contains the following statement of facts relevant to the question certified:

(b) *A statement of all facts relevant to the questions certified*

While we do not believe that resolution of this question requires application of the facts of this particular case, below are selected underlying facts to provide context. In a letter dated February 22, 2001, Pennaco Energy, Inc. ("Pennaco"), a wholly-owned subsidiary of Marathon (collectively, Pennaco and Marathon are referred to as "Marathon"), offered employment to Preston as a relief pumper in Marathon's coal bed methane well operation in the Powder River Basin in northeastern Wyoming. In addition to describing Preston's

proposed responsibilities, compensation, and benefits, the letter indicated that Preston was being hired "under the policy of 'employment at will' whereby you or the Company is free to terminate the employment relationship at any time and for any reason without cause or liability other than as prescribed by law." Preston countersigned the letter on February 27, 2001.

Thereafter, Preston started work for Marathon, although there is a factual dispute as to the precise date. After a bench trial, the district court in this case made a factual finding that Preston began employment with Marathon on March 30, 2001. Preston contends that he began work on March 1, 2001.[1]

On April 5, 2001, Preston signed a document entitled Marathon Oil Company and Subsidiaries Employee Agreement ("the April 2001 Employee Agreement"). Brenda Williams signed on behalf of Marathon on the same date. The agreement contained the following provisions relevant to this dispute:

1. **Definitions**

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(d) "Intellectual Property" means all inventions, discoveries, developments, writings, computer programs and related documentation, designs, ideas, and any other work product made or conceived by EMPLOYEE during the term of employment with MARATHON which (1) relate to the present or reasonably anticipated business of the MARATHON GROUP, or (2) were made or created with the use of Confidential Information or any equipment, supplies, or facilities of the MARATHON GROUP. Such property made or conceived by EMPLOYEE (or for which EMPLOYEE files a patent or copyright application) within one year after termination of employment with MARATHON will be

---

1. We express no opinion as to whether the district court's finding that Preston began work on March 30, 2001 is clearly erroneous, and we do not believe that deciding that factual dispute is necessary to answer the certified question. The

parties both agree that the second employment agreement relevant to this lawsuit, the April 5, 2001 Marathon Oil Company and Subsidiaries Employee Agreement, was executed after Preston began employment.

presumed to have been made or conceived during such employment.

\* \* \* \* \* \*

### 3. Disclosure and Assignment of Intellectual Property

EMPLOYEE agrees to promptly disclose to MARATHON and does hereby assign to MARATHON all Intellectual Property, and EMPLOYEE agrees to execute such other documents as MARATHON may request in order to effectuate such assignment.

Although the agreement provides that it "shall be governed and construed in accordance with Ohio law," both parties agree that Wyoming law applies pursuant to Wyoming's choice of law rules. It is undisputed that Marathon did not provide any additional consideration to Preston for signing this document beyond continued employment.

[Reference to attached documents].

### (c) *The nature of the controversy in which the questions arose*

The present dispute centers around allegations of patent infringement and questions of ownership of two patents that cover a baffle system Preston invented: the '764 patent and the '385 patent. Approximately two months after Preston ceased to be employed by Marathon, he filed a patent application for his invention, which ultimately issued on November 1, 2005 as the '764 patent. Preston is listed as the sole inventor on the '764 patent. On June 14, 2004, Marathon filed a patent application for a similar invention that ultimately issued on April 24, 2007 as the '385 patent. The patent names both Preston and Defendant–Cross–Appellant Thomas Smith ("Smith"), who was a Marathon employee at the time Preston worked at Marathon, as co-inventors.

In the present litigation, Preston asserted counts for, among others, patent infringement and a declaration that Preston is the sole inventor of the '385 patent. Marathon raised affirmative defenses and counterclaimed for a declaration that Preston agreed to assign his rights in the '764 patent to Marathon pursuant to the April 2001 Employee Agreement. Smith also counterclaimed, seeking a declaration that he is a co-inventor of the '764 patent.

As it relates to the certified question, the district court entered a final judgment on August 30, 2010, finding that Preston was the sole inventor of the '764 and '385 patents, and that the April 2001 Employee Agreement is a valid contract, pursuant to which Preston was required to assign his ownership interest in the '764 and '385 patents to Marathon.

On appeal, Preston challenges, among other rulings, the district court's ruling that the April 2001 Employee Agreement requires Preston to assign his rights in the '764 and '385 patents to Marathon, which necessarily requires this court to decide the validity and enforceability of that agreement. Accordingly, the answer to the above-certified question of law may be determinative of one of the issues in this appeal.

(footnote in original and record citation omitted).

### STANDARD OF REVIEW

[¶ 4] W.R.A.P. 11 governs certified questions. Rule 11.01 provides that we may answer a question of law "which may be determinative of the cause" pending in the certifying court and "concerning which it appears there is no controlling precedent" from this Court. "[Q]uestions of the application of the law, including identification of the correct rule, are considered *de novo.*" *Pinnacle Bank v. Villa,* 2004 WY 150, ¶ 5, 100 P.3d 1287, 1289 (Wyo.2004), quoting *EOG Resources, Inc. v. State,* 2003 WY 34, ¶ 7, 64 P.3d 757, 759 (Wyo.2003). *See also, Prokop v. Hockhalter,* 2006 WY 75, ¶ 6, 137 P.3d 131, 133 (Wyo.2006).

### DISCUSSION

[¶ 5] It is helpful to start our analysis of the certified question with a review of the general rights of an employee and an employer to intellectual property conceived by the employee during the term of employment.

Generally an invention is the property of the inventor who conceived, developed, and perfected it, and the law protects and enforces the inventor's property rights in an invention unless he or she has contracted them away. Hence, the mere fact that the inventor was an employee at the time of the invention does not mean that that inventor is required to assign the patent rights to the employer. Thus, in the absence of a special agreement to the contrary, an invention and a patent secured for it belong to the inventor, even though the invention was made during the period of the inventor's employment, and the invention relates to the matter in which the inventor was employed, although the absence of an agreement does not necessarily preclude an employer from claiming a right to the invention.

19 *Williston on Contracts,* § 54:20 (4th ed. 2001). *See also, University Patents, Inc. v. Kligman,* 762 F.Supp. 1212, 1219 (E.D.Pa. 1991). The public policy underlying this general rule is to encourage individuals to exercise their inventive powers. *Banner Metals, Inc. v. Lockwood,* 178 Cal.App.2d 643, 3 Cal. Rptr. 421, 428 (1960). However, "[i]f an employee's job duties include the responsibility for inventing or for solving a particular problem that requires invention, any invention created by that employee during the performance of these responsibilities belongs to the employer...." 19 *Williston on Contracts,* § 54:20. Thus, typically, an employee who is not hired to invent is the owner of any invention discovered during employment.

■ [¶ 6] Nevertheless, when an employee who was not hired to invent does invent something as part of his work duties, the employer is given a "shop right" to use the invention. 27 Am.Jur.2d *Employment Relationship* § 188 (2011) explains:

Where the employee is not hired specifically to design or invent, but nevertheless conceives of a device during working hours with the use of the employer's materials and equipment, the employer is granted an irrevocable but nonexclusive right to use the invention under the shop-right rule.

● **Definition:** The shop right is an employer's royalty or fee, a nonexclusive and nontransferable license to use an employee's patented invention.

Notwithstanding the existence of the shop right, the invention remains the property of the employee, and the employee has the right, conferred by the patent, to exclude all but the employer from the benefits of the invention.

[¶ 7] Mr. Preston was hired by Marathon as a relief pumper and there is no indication that his specific job duties included inventing the baffle system. So, under the general rules (without considering the impact of the assignment), Mr. Preston would be the owner of his invention and Marathon would be entitled to use the invention under the "shop right" principle.

[¶ 8] Mr. Preston, however, signed the April 2001 Employee Agreement, wherein he agreed to "promptly disclose to MARATHON and does hereby assign to MARATHON all Intellectual Property...."[2] It is undisputed that Mr. Preston was an at-will employee at the time he signed the agreement. Marathon's engagement letter to Mr. Preston specifically stated that he was being "hired under the policy of 'employment at will'...." It is also undisputed that Marathon did not provide any additional consideration for the assignment agreement, other than continuation of at-will employment.

■ [¶ 9] In Wyoming, we have recognized that all employment occurs by either express or implied contract. *Wilder v. Cody*

---

**2.** The April 2001 Employee Agreement, which is attached to the certification order, contained a provision which allowed the employee to list "unpatented inventions and unpublished writings" he had created prior to the agreement and stated that Marathon agreed "such inventions and writings are NOT Intellectual Property [under the definition set forth in the agreement] and are NOT the property of MARATHON hereunder." Mr. Preston listed a $CH_4$ resonating mani-

fold as an unpatented invention he had created prior to the agreement. There is, therefore, a factual issue in this case as to whether Mr. Preston had invented the baffle system prior to signing the assignment agreement. Our decision in this case should not be construed as addressing assignments of pre-existing intellectual property rights. We specifically limit our holding to intellectual property developed after the date of the assignment agreement.

*Country Chamber of Commerce*, 868 P.2d 211, 216 (Wyo.1994). There are two types of employment relationships—employment which requires cause for termination and at-will employment. *Id.* at 217–19; *Brodie v. General Chemical Corp.*, 934 P.2d 1263, 1265 (Wyo.1997). "[E]mployment is presumed to be at will unless an express or implied contract states otherwise." *McLean v. Hyland Enterprises, Inc.*, 2001 WY 111, ¶ 21, 34 P.3d 1262, 1268 (Wyo.2001). At-will employment may be terminated by either the employer or the employee at any time for any or no reason, with no legal consequence. *Finch v. Farmers Co-op. Oil Co.*, 2005 WY 41, ¶ 10, 109 P.3d 537, 541 (Wyo.2005); *Brodie*, 934 P.2d at 1265. By its nature, then, an at-will employment relationship " 'is subject to modification at any moment by either party as a condition of it continuing at all.' " [3] *Long v. Forbes*, 58 Wyo. 533, 136 P.2d 242, 246 (1943), quoting *Norton v. Brookline*, 181 Mass. 360, 363, 63 N.E. 930, 931 (Mass.1902).

[¶ 10] This legal and factual background sets up our current inquiry—whether an at-will employee's assignment of intellectual property rights to his employer must be accompanied by additional consideration, beyond the continuation of his employment, to be enforceable. Other jurisdictions have addressed that issue, with mixed results.

[¶ 11] Mr. Preston points to *Hewett v. Samsonite Corp.*, 32 Colo.App. 150, 507 P.2d 1119 (1973) and *Harsco Corp. v. Zlotnicki*, 779 F.2d 906 (3d.Cir.1985) as support for his argument that additional consideration is required. Hewett was employed by Samsonite as "foreman of the model shop in which prototype models were fabricated from designs drawn by Samsonite's design and engineering department." *Id.* at 1120. Although he was not hired to invent, Hewett invented three products, and Samsonite required him to assign the patent rights. Hewett contended that the assignment was not valid because no separate consideration was given by Samsonite for it. Samsonite argued that, by allowing Hewett to continue working for the company, "sufficient consideration was given

to make the assignment binding." *Id.* at 1121. The Colorado Court of Appeals held that continued employment was not sufficient consideration for the patent assignment, rendering it invalid. Hewett, therefore, owned the inventions, subject to Samsonite's shop rights. *Id.* at 1121–22.

[¶ 12] In *Harsco*, Zlotnicki worked for Harsco as a staff engineer. He conceived a new invention as part of his work duties, and Harsco required him to assign his patent rights to it. *Harsco*, 779 F.2d at 907–08. The Third Circuit applied Pennsylvania law and upheld the assignment, but interpreted the assignment agreement as containing a promise by Harsco to employ Zlotnicki for a reasonable time. *Id.* at 910–11. That case, therefore, arguably stands for the proposition that additional consideration beyond continued at-will employment is required to support an assignment of patent rights to the employer.

[¶ 13] Marathon directs us to other cases which hold to the contrary—continued employment is sufficient consideration to support an agreement to assign intellectual property. In *Goodyear Tire & Rubber Co. v. Miller*, 22 F.2d 353, 354–56 (9th Cir.1927), the Ninth Circuit Court of Appeals held that continued employment was sufficient consideration to support a patent assignment agreement. The court noted that at the time the assignment was presented to Miller, Goodyear was under no obligation to continue to employ him. Goodyear, therefore, had the same right to make the assignment agreement a condition of retention as it would have had to impose it as a condition for hiring him in the first place. The court observed that Goodyear did not bind itself to employ Miller for any stipulated period and Miller did not agree to remain for any designated length of time. Thus, both parties were on the same footing and "their rights and obligations were reciprocal." *Id.* at 355. *See also, Hebbard v. American Zinc, Lead & Smelting Co.*, 161 F.2d 339, 345 (8th Cir. 1947) (refusing to rescind contracts for as-

---

**3.** In contrast, when the parties have entered into a contract which incorporates a requirement that cause be demonstrated before the employee can be dismissed, separate consideration is required

before the employer can change the employment relationship to terminable at-will. *See, e.g., Brodie*, 934 P.2d at 1268–69; *McIlravy v. Kerr–McGee Corp.*, 119 F.3d 876, 881 (10th Cir.1997).

signment of a patent where the consideration was simply "continued employment")[4]; Edward L. Raymond, Jr., Annotation, *Construction and Effect of Provision of Employment Contract Giving Employer Right to Inventions Made by Employee*, 66 A.L.R.4th 1135 § 8[c] & [d] (orig. published 1988, with cum. supps).

[¶ 14] We are, therefore, faced with a split of authority on the question of whether additional consideration is required to support a post-employment assignment of intellectual property. Preston argues that our decision in *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531 (Wyo.1993) presents an analogous situation and obligates us to rule that consideration in addition to continued at-will employment is necessary to support a post-employment assignment of intellectual property rights.

[¶ 15] *Hopper* involved a covenant not to compete given by an employee after commencement of her employment. In analyzing the effectiveness of the non-compete provision, we looked at public policy which generally disfavors such agreements.

> The common law policy against contracts in restraint of trade is one of the oldest and most firmly established. Restatement (Second) of Contracts §§ 185–188 (1981) (Introductory Note at 35). *See Dutch Maid Bakeries v. Schleicher*, 58 Wyo. 374, 131 P.2d 630, 634 (1942). The traditional disfavor of such restraints means covenants not to compete are construed against the party seeking to enforce them. *Commercial Bankers Life Ins. Co. of America v. Smith*, 516 N.E.2d 110, 112 (Ind.App. 1987). The initial burden is on the employer to prove the covenant is reasonable and has a fair relation to, and is necessary for, the business interests for which protection is sought. *Tench v. Weaver*, 374 P.2d 27, 29 (Wyo.1962).

> Two principles, the freedom to contract and the freedom to work, conflict when courts test the enforceability of covenants not to compete. *Ridley v. Krout*, 63 Wyo. 252, 180 P.2d 124, 128 (1947).

*Hopper*, 861 P.2d at 539. Thus, we closely scrutinize covenants not to compete, employing a rule of reason analysis, to ensure there is a proper balance between the competing interests of the employer and employee. *Id.* "A valid and enforceable covenant not to compete requires a showing that the covenant is: (1) in writing; (2) part of a contract of employment; (3) based on reasonable consideration; (4) reasonable in durational and geographical limitations; and (5) not against public policy." *Id.* at 540 (citations omitted).

[¶ 16] Addressing the requirement that a covenant not to compete be supported by "reasonable consideration," we held that public policy favored separate consideration and continued at-will employment was not sufficient consideration to support such an agreement. Our ruling was based, in part, on the sanctity of the right to earn a living. We stated "the employee rarely 'bargains for' continued employment in exchange for a potentially onerous restraint on the ability to earn a living." *Id.* at 541, quoting Howard A. Specter & Matthew W. Finin, *Individual Employment Law and Litigation* § 8.02 (1989).

[¶ 17] We explained the potential ramifications if we were to rule that continued at-will employment was sufficient consideration for an agreement not to compete:

> The contract permitted either Dr. Hopper or her corporate employers to terminate her employment with notice. The agreement did not state a length of employment and it permitted termination at will. Without more, the terms present the potential for an unreasonable restraint of trade. For example, if an employer hired an employee at will, obtained a covenant not to compete, and then terminated the employee, without cause, to arbitrarily restrict competition, we believe such conduct would constitute bad faith. Simple justice requires that a termination by the employer

---

**4.** Both *Goodyear* and *Hebbard* involved employees who were hired specifically to invent products and, as such, could have been decided using the general rule that employers own any inventions created by employees who are hired to invent. *Goodyear*, 22 F.2d at 354–56; *Hebbard*, 161 F.2d at 342. However, each of the cases also discussed the consideration issue, making the decisions relevant to our inquiry.

of an at will employee be in good faith if a covenant not to compete is to be enforced. *Dutch Maid Bakeries,* 131 P.2d at 635–36; *American Nat. Ins. Co. v. Coe,* 657 F.Supp. 718, 723 (E.D.Mo.1986). *See Adrian N. Baker & Co. v. Demartino,* 733 S.W.2d 14, 18 (Mo.App.1987) (enforcing covenant not to compete when discharge of employee occurred with good cause).

*Hopper,* 861 P.2d at 541–42.

[¶ 18] Mr. Preston maintains that the same rule should apply to agreements to assign intellectual property, i.e., separate consideration should be required. Case law from other jurisdictions discusses the differences between covenants not to compete and agreements to assign intellectual property. In *MAI Basic Four, Inc. v. Basis, Inc.,* 880 F.2d 286 (10th Cir.1989), for example, the Tenth Circuit Court of Appeals interpreted New Mexico law and recognized that covenants not to compete are generally characterized as restrictive covenants; however, patent waiver agreements between employers and employees do not fall within that definition and must, therefore, be treated differently. The court remarked that, with patent assignment agreements, employees remain free to work for "whomever they wish, wherever they wish, and at whatever they wish, subject only to ... the requirement that [the employees] assign to [the employer] any work product relating to [the employer's] business that was developed by [the employees] while they were employed by the [employer] or shortly thereafter." *Id.* at 287–88. Because of those differences, unlike covenants not to compete, agreements to assign patents do not have to be supported by separate consideration. *Id.*

[¶ 19] *Harsco,* which in some aspects supports Mr. Preston's position that additional consideration is required for patent assignment agreements, specifically stated that non-compete agreements are different than patent assignment agreements. "[R]estrictive covenant [non-competition] cases differ from assignments of patent rights because restrictive covenants hamper a person's ability to earn a living, whereas patent assignments affect only property rights to patents." *Harsco,* 779 F.2d at 910. The court, there-fore, held that the rationale which requires additional consideration for non-competition agreements does not apply to patent assignment agreements. *Id.*

[¶ 20] We agree that there is a fundamental difference between non-competition agreements and intellectual property assignment agreements. The concerns with restraints on trade which attend non-competition agreements simply are not present for intellectual property assignment agreements. That is particularly obvious here, where Mr. Preston only agreed to assign the rights to inventions that he made or conceived while employed by Marathon. The agreement did not limit his right to earn a living, or, for that matter, his rights to inventions that were not related to Marathon's business or were not created with the use of Marathon's confidential information, equipment, supplies or facilities. The assignment agreement also did not affect Mr. Preston's rights to inventions he created after his employment with Marathon was over, although intellectual property conceived or made by him within one year after termination was "presumed to have been made or conceived during" his employment. Given that the intellectual property assignment agreement did not affect Mr. Preston's right to earn a living or otherwise impose an improper restraint on trade, *Hopper* does not govern our decision in this case.

[¶ 21] We must, consequently, return to the basic precepts of at-will employment. As we mentioned earlier, at-will employment is terminable by either party at any time for any reason or no reason at all. Because of its terminable nature, either party has the power to modify the terms of the employment at any time, and the other party may either accept the new terms and carry on with the employment relationship or reject the new terms and terminate the relationship. The policies behind at-will employment were explained in *Townsend v. Living Centers Rocky Mountain, Inc.,* 947 P.2d 1297, 1299 (Wyo.1997):

> Our jurisprudence in the employment context has developed from the premise that the stability of the business community is our primary consideration and that stability is best served by applying con-

tract principles in the employment context. Based on that fundamental precept we have produced the rule that, unless an express or implied contract states or establishes otherwise, all employment is a contract for at-will employment. *Brodie v. General Chemical Corp.*, 934 P.2d 1263, 1265 (Wyo.1997). An at-will employee can be terminated for any or no reason at all. *Id.* The at-will employment rule offers no remedy to an employee who has been arbitrarily or improperly discharged and has suffered adverse effects on his or her economic and social status regardless of how devastating those effects actually were. Stability in the business community is preserved because, at least at the state level, employers' and employees' decisions remain subject only to the express or implied contracts into which they have voluntarily entered or subject to statute.

[¶ 22] We believe that the stability of the business community is best served by ruling, consistent with our at-will employment jurisprudence, that no additional consideration is required to support an employee's post-employment execution of an agreement to assign intellectual property to his employer. If the employee does not agree to that modification of the terms of his employment, he can terminate the relationship without any penalties.

[¶ 23] The answer to the certified question is, therefore, "yes."