# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 105

APRIL TERM, A.D. 2021

September 27, 2021

MICHEL SKAF, M.D.,

Appellant
(Defendant),

v.

WYOMING CARDIOPULMONARY
SERVICES, P.C., a Wyoming corporation,

Appellee
(Plaintiff).

S-20-0266

*Appeal from the District Court of Natrona County*
*The Honorable Daniel L. Forgey, Judge*

*Representing Appellant:*
Weston W. Reeves and Anna Reeves Olson, Park Street Law Office, Casper, Wyoming. Argument by Mr. Reeves.

*Representing Appellee:*
Frank R. Chapman and Patrick Lewallen, Chapman Valdez & Lansing, Casper, Wyoming. Argument by Mr. Lewallen.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*GRAY, J., delivers the opinion of the Court; DAVIS, J., files a specially concurring opinion, in which KAUTZ, J., joins.*

*\* Chief Justice at time of oral argument.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    Dr. Michel Skaf is a cardiologist who signed an agreement not to compete when he became a shareholder in Wyoming Cardiopulmonary Services (WCS).  He appeals from the entry of a judgment confirming an arbitration award for breach of the agreement, and a second judgment requiring additional payment.  The Arbitration Panel (the Panel) concluded that the parties' non-compete agreement was enforceable if modified significantly.  Before awarding damages, the Panel reformed the provision prohibiting medical services, modified the geographical scope of the agreement, and rewrote the clause allowing Dr. Skaf to practice medicine at the Wyoming Medical Center.  The district court confirmed the Panel's decision, entered a total judgment of $221,000 in favor of WCS, and denied WCS' request for an injunction.

[¶2]    Dr. Skaf claims the Panel erred in enforcing the agreement because a non-compete agreement between physicians is against public policy, and the Panel made a manifest error of law when it ignored Wyoming's clear public policy against restraint of trade.

[¶3]    WCS filed two motions to dismiss this appeal which we took under advisement. The first motion claims Dr. Skaf's employment contract waived his right to appeal the district court's confirmation of the Panel's decision.  The second motion claims Dr. Skaf lacks standing.

[¶4]    WCS' motion to dismiss for lack of standing is denied.  We also deny WCS' motion to dismiss based on waiver and decline to declare covenants not to compete between physicians necessarily violate public policy.  Finally, we find the Panel made a manifest error of law and reverse the confirmation of the Panel's decision, vacate the award, and remand this matter to the district court.

## *ISSUES*

[¶5]    The issues are:

      1.     Does Dr. Skaf have standing?

      2.     Did Dr. Skaf waive his right to appeal the Panel's determination as confirmed by the district court?

      3.     Are covenants not to compete between physicians void as against Wyoming's public policy?

      4.     Did the Panel make a manifest error of law in violation of specific public policy arising from well-established legislative, judicial, or administrative mandate?

1

## FACTS

[¶6]    In 2004, Dr. Skaf entered into an employment agreement with WCS.  In 2009, Dr. Skaf and WCS negotiated a new employment agreement (the Agreement) when Dr. Skaf became a shareholder in WCS.  Dr. Skaf received a substantial increase in salary at that time.  The Agreement contained a covenant not to compete.  The non-compete clause reads:

> 11.1 <u>Covenant Not to Compete</u>.  As an essential part of this Agreement, Employee covenants with Employer that if Employee's employment with Employer terminates for any reason, Employee will not practice medicine for a period of two years following termination of employment within a 100-mile radius of Casper, Wyoming, and each outreach clinic of Employer.[1]  This covenant will apply to Employee whether he engages in the subsequent practice of medicine in an individual capacity, as an employee of another concern, or as a principal of a partnership, corporation, or other entity.  Notwithstanding the foregoing, this provision is not intended to, nor will it be construed as, limiting in any way Employee's right to have hospital privileges or to perform medical procedures at Wyoming Medical Center, Casper, Wyoming.

The Agreement also included a provision establishing liquidated damages.  The provision required a minimum payment of $1,000 for any WCS patient Dr. Skaf treated within two years from separation from WCS.  All claims arising from the Agreement, except claims for injunctive relief, were subject to arbitration, and the parties expressly waived the right to appeal any arbitration judgment entered by the district court.

[¶7]    In 2015, WCS terminated Dr. Skaf for cause.  Despite the non-compete provision, Dr. Skaf immediately set up his own practice in Casper where he provided cardiology services to patients, including former WCS patients.  WCS filed a complaint, a motion seeking an injunction, and a motion to compel arbitration.  The motion to compel arbitration was granted, and the motion for an injunction was stayed until the arbitration process concluded.

---

[1] At the time of the arbitration, the outreach communities included: Lander, Riverton, Thermopolis, Worland, Rawlins, Buffalo, Gillette, Douglas, Wheatland, and Lusk.  The 100-mile radius prohibition covered nearly all of Wyoming and crossed into Montana, South Dakota, Nebraska, and Colorado.

[¶8]    After extensive discovery and two hearings, the Arbitration Panel found that the covenant not to compete was enforceable once it modified the scope of the prohibited services and limited the geographic area.  It rewrote the Agreement as it related to Dr. Skaf's privileges to practice at the Wyoming Medical Center.

[¶9]    WCS filed a motion in district court to confirm the award and requested a permanent injunction.  The district court confirmed the Panel's decision to enforce the covenant not to compete and entered judgment of $193,000—$1,000 for each of the 193 WCS patients treated by Dr. Skaf.  WCS then filed a motion to modify the award, and the court ordered the Panel to reconvene to address former WCS patients treated by Dr. Skaf who were not discovered prior to the original arbitration.  The Panel found Dr. Skaf had treated an additional 28 patients and awarded WCS $1,000 for each of these patients. The district court entered a second judgment of $28,000 and denied the motion for an injunction.  This appeal followed.

[¶10] Dr. Skaf presents three public policy arguments in his appeal.  First, he argues public policy prohibits a pre-dispute appeal waiver, relying on revisions to the Uniform Arbitration Act.  Next, he asserts a non-compete agreement between physicians is a violation of public policy, and always unenforceable, as a matter of law.  Finally, he contends that the Panel's decision should be vacated because it rests on a manifest error of law—that the non-compete agreements are strongly favored in Wyoming, and their enforcement promotes public policy.  We first address WCS' motion to dismiss for lack of standing and then separately review the three remaining issues based on Dr. Skaf's public policy arguments.

## DISCUSSION

### I.    Does Dr. Skaf have standing?

[¶11]  WCS claims Dr. Skaf has no standing to bring this appeal because he has never stopped practicing medicine; he was not enjoined from doing so; and he has not suffered a concrete and particularized injury.  "The question of standing is a legal issue that we review *de novo*."  *In re Est. of Johnson*, 2010 WY 63, ¶ 4, 231 P.3d 873, 876 (Wyo. 2010).  WCS' argument rests on the first factor of Wyoming's long-established test for standing articulated in *Brimmer v. Thomson*—a justiciable controversy.  A justiciable controversy requires "existing and genuine, as distinguished from theoretical, rights or interests."  *Allred v. Bebout*, 2018 WY 8, ¶ 37, 409 P.3d 260, 270 (Wyo. 2018) (quoting *Brimmer v. Thomson*, 521 P.2d 574, 578 (Wyo. 1974)); *HB Fam. Ltd. P'ship v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2020 WY 98, ¶ 18, 468 P.3d 1081, 1088 (Wyo. 2020).  "The person alleging standing must show a 'perceptible,' rather than a 'speculative' harm from the action[.  A] remote possibility of injury is not sufficient to confer standing." *Halliburton Energy Servs., Inc. v. Gunter*, 2007 WY 151, ¶ 11, 167 P.3d 645, 649 (Wyo. 2007) (quoting *Sinclair Oil Corp. v. Wyoming Pub. Serv. Comm'n*, 2003 WY 22, ¶ 13, 63

3

P.3d 887, 894–95 (Wyo. 2003)). The district court confirmed two money judgments against Dr. Skaf, one for $193,000 and a second for $28,000. These judgments result in perceptible harm. Dr. Skaf has standing.

## II. Did Dr. Skaf waive his right to appeal the Panel's determination as confirmed by the district court?

[¶12] In a separate motion to dismiss, WCS argues we lack jurisdiction because the Agreement contains a valid waiver of appeal from the district court's entry of judgment after arbitration. Dr. Skaf responds that a waiver of appeal is void if made prior to a dispute requiring arbitration, as a violation of public policy. WCS submits the waiver is enforceable as it does not waive all judicial review, but only the right to an appeal from judgment on arbitration entered by the district court.

### A. Standard of Review

[¶13] "While the question of waiver is often one of fact, when the facts and circumstances relating to the subject are admitted or clearly established, waiver becomes a question of law which we consider *de novo*." *Verheydt v. Verheydt*, 2013 WY 25, ¶ 21, 295 P.3d 1245, 1250–51 (Wyo. 2013). The waiver in this case is contained in the Agreement. "The interpretation and construction of contracts is a matter of law for the courts" and is reviewed de novo. *Hoecher v. Runyan*, 2001 WY 39, ¶ 11, 21 P.3d 339, 342 (Wyo. 2001).

### B. Analysis

[¶14] "We have defined waiver as the intentional relinquishment of a known right[2] that must be manifested in some unequivocal manner." *Jensen v. Fremont Motors Cody, Inc.*, 2002 WY 173, ¶ 16, 58 P.3d 322, 327 (Wyo. 2002). "[T]he three elements of waiver are: 1) an existing right; 2) knowledge of that right; and 3) an intent to relinquish it." *Id.*

[¶15] The Agreement provides:

---

[2] The Wyoming Uniform Arbitration Act (the Act) allows appeal from an order confirming an arbitration award. According to the Act:

    (a) An appeal may be taken from:
        (i) An order denying the application to compel arbitration;
        (ii) An order granting an application to stay arbitration;
        (iii) An order confirming or denying confirmation of an award;
        (iv) An order modifying or correcting an award;
        (v) An order vacating an award without directing a rehearing; or
        (vi) A final judgment or decree entered by the court.

Wyo. Stat. Ann. § 1-36-119(a) (LexisNexis 2021).

Except as provided in Paragraph 20 [ability to apply for an injunction], all disputes, controversies, claims or demands of any kind or nature arising between the parties in connection with this Agreement, whether at law or in equity or based upon common law or any federal or state statute, rule or regulation, will be submitted to arbitration. The findings, conclusions and award rendered in such arbitration will be binding upon the parties and will finally determine all questions o[f] fact relating to the dispute. Judgment upon the arbitration award *may be entered* in the appropriate court, state or federal, having jurisdiction, *and each party expressly waives any right to appeal such judgment. . . .* The parties agree that failure to comply with the provisions of this paragraph will constitute grounds for the dismissal of any suit, action or proceeding instituted in any federal, state or local court . . . .

(Emphasis added.)

[¶16] "As a general rule a person may waive a statutory or constitutional right enacted for the benefit of that person, if that right does not affect public policy or public interest." *Borman v. Sweetwater Cnty. Sch. Dist. No. 2*, 627 P.2d 1364, 1368 (Wyo. 1981). Such waiver, however, is not favored; it must be reflected by clear, affirmative words or actions. *Jensen*, ¶ 22, 58 P.3d at 328. "Whether a waiver was made voluntarily, knowingly, and intelligently depends upon the surrounding facts and circumstances." *MAM v. State Dep't of Fam. Servs.*, 2004 WY 127, ¶ 14, 99 P.3d 982, 985 n.3 (Wyo. 2004) (citing *Solis v. State*, 851 P.2d 1296, 1299 (Wyo. 1993)).

[¶17] Dr. Skaf argues the issue is not whether the Agreement contains an express waiver, but whether the waiver is void because it was made prior to an arbitrable dispute. This is a matter of first impression for Wyoming.

[¶18] "There is conflicting authority as to whether parties may waive judicial review of arbitration awards." 6 C.J.S. *Arbitration* § 215, Westlaw (database updated August 2021). In *In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*, the Ninth Circuit held that "[p]ermitting parties to contractually eliminate *all judicial review* of arbitration awards would not only run counter to the text of the FAA [Federal Arbitration Act,[3]] but would

---

[3] The Federal Arbitration Act is similar, but not identical, to the Wyoming Uniform Arbitration Act. *See Miller v. Life Care Ctrs. of Am., Inc.*, 2020 WY 155, ¶ 14, 478 P.3d 164, 168–69 (Wyo. 2020) ("Under the Federal Arbitration Act, 9 U.S.C. §§ 1 through 16, and the Wyoming Uniform Arbitration Act, Wyo.

also frustrate Congress's attempt to ensure a *minimum level of due process* for parties to an arbitration." *In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*, 737 F.3d 1262, 1268 (9th Cir. 2013) (emphasis added) (overruled by statute). In *MACTEC, Inc. v. Gorelick*, the Tenth Circuit held that agreements to waive appellate review of a district court's confirmation of an arbitration award are valid if "the clause applies only to an *appellate court's* review of the district court's judgment (presumably confirming or vacating the arbitrator's award)." *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 827–30 (10th Cir. 2005). The Tenth Circuit reasoned that a provision prohibiting appellate, but not district court, review is "a compromise whereby the litigants trade the risk of protracted appellate review for a one-shot opportunity before the district court." *Id.* at 830. Such provisions are consistent with "the fundamental policy behind the FAA . . . to reduce litigation costs by providing a more efficient forum." *Id.* at 829; *see also Beckley Oncology Assocs., Inc. v. Abumasmah*, 993 F.3d 261, 264–65 (4th Cir. 2021).

[¶19] We turn first to Dr. Skaf's argument, that the waiver is void because it was made prior to an arbitrable dispute. Dr. Skaf relies on revisions to the Uniform Arbitration Act. In 2000, the addition of Section 4(b) to the Uniform Arbitration Act prohibited a waiver of appeal "[b]efore a controversy arises that is subject to an agreement to arbitrate." Dr. Skaf provides a list of eighteen states that have adopted the amendment to buttress his position that waiver of appellate review before a dispute arises contravenes public policy. While Dr. Skaf's argument has some appeal, the Wyoming Legislature has not adopted this revision.

[¶20] We do not decide whether public policy prohibits a waiver of a pre-arbitral dispute because Doctor Skaf's remaining arguments raise legitimate and colorable claims of violation of public policy. *See infra* ¶¶ 22, 33. "[A] person may not generally waive a statutory or constitutional right enacted for the benefit of that person if public interests are jeopardized." *Jensen*, ¶ 22, 58 P.3d at 328 (citing *Taylor v. State*, 612 P.2d 851, 861–65 (Wyo. 1980)); *Beck v. State*, 2005 WY 56, ¶ 12, 110 P.3d 898, 901 (Wyo. 2005) (In the criminal context, the rule is that "A criminal defendant may waive any personal right 'so long as there is no violation of public policy and the public's interests are not thereby jeopardized.'" (quoting *Meerscheidt v. State*, 931 P.2d 220, 225 (Wyo. 1997))); *see also Deptula v. Simpson*, 164 P.3d 640, 645 (Alaska 2007) ("[P]arties may not waive statutory rights '[where] a question of public policy is involved[.]'" (quoting *Ramsey v. City of Sand Point*, 936 P.2d 126, 130 (Alaska 1997))); *Scully v. Tillery*, 926 N.E.2d 154 (Mass. 2010) (same).

---

Stat. Ann. §§ 1-36-101 through 119 (LexisNexis 2019), the rights and obligations to arbitrate are created by contract."). We "apply state law principles governing contract formation in deciding whether an arbitration agreement is enforceable." *Miller*, ¶ 14, 478 P.3d at 168–69.

[¶21] Doctor Skaf's remaining issues raising claims of violation of public policy preclude a waiver in this case. The right to appeal these issues is not waived.

### III. *Are covenants not to compete between physicians void as against Wyoming's public policy?*[4]

[¶22] Dr. Skaf asserts we should adopt a public policy which prohibits non-compete agreements between physicians as a matter of law. If we were to accept his invitation, physician non-compete agreements would always be unenforceable in Wyoming. *See Ecocards v. Tekstir, Inc.*, 2020 WY 38, ¶ 27, 459 P.3d 1111, 1120 (Wyo. 2020) ("Forum selection clauses are . . . unenforceable if they violate the public policy of the state where the suit was brought."); *Nuhome Invs., LLC v. Weller*, 2003 WY 171, ¶ 10, 81 P.3d 940, 945 (Wyo. 2003) (We "enforce the provisions of the contract between the parties as long as the provisions are not contrary to Wyoming law, public policy, or the general interests of Wyoming's citizens."); *Fremont Homes, Inc. v. Elmer*, 974 P.2d 952, 954 (Wyo. 1999) ("[A] contract term exempting a party from tort liability for harm caused intentionally is unenforceable due to public policy considerations[.]").

### A. Standard of Review

[¶23] De novo review is required when a challenge to a consensual arbitration award raises a legitimate and colorable claim of violation of public policy. *City of New Haven v. AFSCME, Council 4, Loc. 3144*, 257 A.3d 947, 961–62 (Conn. 2021); *Burr Rd. Operating Co. II, LLC v. New England Health Care Emps. Union, Dist. 1199*, 114 A.3d 144, 153 (Conn. 2015) ("de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy" (citations omitted)); *City of Des Plaines v. Metro. All. of Police Chapter No. 240*, 2015 IL App (1st) 140957, ¶ 20, 30 N.E.3d 598, 604 (the question of whether an award violates public policy is one of law reviewed de novo).

### B. Analysis

---

[4] Dr. Skaf phrases this issue in his appellate brief as "[w]hether a covenant not to compete in physician employment agreements *in an underserved area* with [the] resulting limitations on a patient's choice of a physician is against public policy." (Emphasis added.) The Panel found Dr. Skaf did not establish the location of his new practice, Casper, is in an underserved area. Dr. Skaf did not raise this factual issue in his brief to the district court and has not shown by clear and convincing evidence that the Panel erred in reaching that factual conclusion. We therefore will not consider this aspect of his argument. *Wild W. Trading Co. v. gbs&h Architects, Landscape Architects, Planners, Inc.*, 881 P.2d 1070, 1075 (Wyo. 1994) ("Wild West failed to present clear and convincing evidence to demonstrate that the arbitrators based their denial on a manifest mistake of fact or on some other improper reason."); *Welty v. Brady*, 2005 WY 157, ¶ 21, 123 P.3d 920, 926 (Wyo. 2005) ("[A]bsent a mistake upon the evidence tantamount to fraud . . . or willful and intentional failure to consider it, the weight and sufficiency of the evidence is for the arbitrators to determine." (citation and internal quotation marks omitted)).

[¶24]  "Generally, . . . specific expression of public policy arises from well-established legislative, judicial, or administrative mandate." *Dynan v. Rocky Mountain Fed. Sav. & Loan*, 792 P.2d 631, 640 (Wyo. 1990).  Dr. Skaf makes several arguments in support of his contention that this Court should declare non-compete clauses between physicians void as against public policy.  First, he claims a physician non-compete agreement is analogous to an attorney non-compete agreement, and attorney non-compete agreements are unenforceable given the public policy barrier found in the Wyoming Rules of Professional Conduct.  Rule 5.6 provides:

> A lawyer shall not participate in offering or making:
>
> > (a)  a partnership, shareholders, operating, employment, or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or
> >
> > (b)  an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.
> >
> > **Comment.** — *[1] An agreement restricting the right of lawyers to practice after leaving a firm not only limits their professional autonomy but also limits the freedom of clients to choose a lawyer.  Paragraph (a) prohibits such agreements except for restrictions incident to provisions concerning retirement benefits for service with the firm.*

Dr. Skaf argues Comment 1 applies equally to the physician-patient relationship.

[¶25]  He next cites to AMA Ethic Opinion 11.2.3.1 as authority.  AMA Ethic Opinion 11.2.3.1 provides in relevant part:

> Physicians should not enter into covenants that:
>
> > (a)  Unreasonably restrict the right of a physician to practice medicine for a specified period of time or in a specific geographical area on termination of a contractual relationship; and

8

> > (b)  Do not make reasonable accommodation for patients' choice of physician.

AMA Ethics Restrictive Covenants, *Code of Medical Ethics Opinion 11.2.3.1* https://www.ama-assn.org/delivering-care/ethics/restrictive-covenants (last visited Sept. 14, 2021).

[¶26]  Finally, he points to 42 U.S.C.A. § 1395a which states:

> > (a)  **Basic freedom of choice**

> > Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him such services.

42 U.S.C.A. § 1395a (West 2020).

[¶27]  While we have not addressed this issue, other courts have rejected analogous arguments in the absence of clear legislative directive.  In *Murfreesboro Med. Clinic, P.A. v. Udom*, a case extensively cited by Dr. Skaf and the only case we have found in support of his position, the Tennessee Supreme Court ruled:

> > Due to the important public policy considerations implicated by physicians' covenants not to compete, along with the ethical problems raised by them, and our state legislature's decision not to statutorily validate all such covenants, we conclude that non-compete agreements such as the one at issue in the present case are inimical to public policy and unenforceable.  Public policy considerations such as the right to freedom of choice in physicians, the right to continue an on-going relationship with a physician, and the benefits derived from having an increased number of physicians practicing in any given community all outweigh the business interests of an employer.  In addition, we are guided by the American Medical Association's ethical standards which view covenants not to compete as against public policy, because according to the AMA, such agreements "restrict competition, disrupt continuity of care, and potentially deprive the public of medical services."  *Also persuasive is the fact that our legislature has elected to affirmatively provide for such covenants, but in very limited contexts.*  For

9

these reasons, we hold that except for restrictions specifically provided for by statute, covenants not to compete are unenforceable against physicians.

*Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 683–84 (Tenn. 2005) (emphasis added).

[¶28]   This ruling was superseded by statute.   Tenn. Code Ann. § 63-1-148 (West 2017) (permitting non-compete agreements between physicians in limited circumstances). Another example of a statutory prohibition of non-compete agreements is found in Idaho Code Ann. §§ 39-6109 and 39-6109A (West 2021) which prohibit non-compete agreements with foreign-trained physicians brought to Idaho through a J-1 or national interest visa waiver program to serve communities unable to meet their physician needs with American doctors.   Colo. Rev. Stat. Ann. § 8-2-113(3) (West 2019) voids non-compete agreements and contains a special provision applicable to physicians.   "Medical practices and other businesses that employ physicians may not prohibit physicians from competing, but they may enforce agreements that 'require the payment of damages in an amount that is reasonably related to the injury suffered by reason of termination of the agreement.'"   *See* Theresa L. Corrada & Roberto L. Corrada, *Noncompetition agreements with doctors*, 16 Colo. Prac., Employment Law & Practice § 7:6 (3d ed. West 2020). There are no similar Wyoming statutes.

[¶29]   We look, next, to the Illinois Supreme Court's decision in *Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 92 (Ill. 2006).   *See also Cent. Indiana Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 727–28 (Ind. 2008).   In *Mohanty*, the plaintiff contended that restrictive covenants in physician employment contracts should be held void as against public policy in Illinois.   The court began by noting that "this court has a long tradition of upholding the right of parties to freely contract."   *Mohanty*, 866 N.E.2d at 92. "[P]laintiffs carry a heavy burden of showing that restrictive covenants in physician employment contracts are against the public policy of this state."   *Id.* at 93.

[¶30]   Turning first to the contention that physician restrictive covenants should be held void for the same reason that attorney restrictive covenants are held void, the court stated:

> [O]ur determination that noncompetition covenants in attorney employment contracts were void was grounded in the fact that such covenants were in direct "conflict with Rule 5.6" of the Illinois Rules of Professional Conduct, which gave expression to important considerations of public policy. Thus, we held, "it would be inimical to public policy to give effect to the offending provisions."   In the present case, there are no similar expressions of public policy which require us

to find restrictive covenants in the employment contracts of medical practitioners unenforceable in Illinois.

*Id.* at 93 (internal citations omitted).

[¶31] The court next addressed the plaintiff's assertion that AMA Opinion 9.02 provides the necessary expression of public policy to invalidate restrictive covenants in physician employment contracts. The court disagreed, saying:

> AMA Opinion 9.02, while informative, is not the equivalent of an Illinois statute or rule of professional conduct and, for that reason, does not provide a clear expression of the public policy of this state. Thus, AMA Opinion 9.02 cannot dictate the manner in which restrictive covenants should be construed in Illinois. That having been said, we point out that Opinion 9.02 does not prohibit, but merely *discourages*, restrictive covenants in medical employment contracts. Furthermore, the AMA's position on restrictive covenants, as set forth in Opinion 9.02, is commensurate with the manner in which restrictive covenants in physician employment contracts are treated in this state. Historically, covenants restricting the performance of medical professional services have been held valid and enforceable in Illinois as long as their durational and geographic scope are not unreasonable, taking into consideration the effect on the public and any undue hardship on the parties to the agreement.

*Id.* at 94. The court concluded the plaintiffs had failed to show that "physician restrictive covenants are contrary to the constitution, statutes or judicial decisions of [Illinois]. Nor ha[d] they shown that these covenants are manifestly injurious to the public welfare." *Id.* at 95. The court recognized reasons which may support disfavoring restrictive covenants in physicians' employment agreements but noted countervailing reasons such as the encouragement of established physicians "to take on younger, inexperienced doctors." The court concluded:

> We do not know, and are ill-equipped to determine, what the possible consequences might be if we were to adopt the sweeping changes plaintiffs advocate. It is possible that patients would be more adversely affected if we were to ban reasonable restrictive covenants in physician employment contracts. For this reason, we believe that prohibiting restrictive covenants in medical practice contracts is a

11

decision better left to the legislature, where the competing interests can be fully aired.

*Id.*

[¶32] The Wyoming Legislature has not acted to ban or limit physician non-compete agreements. Our precedent ably guides our analysis of non-compete agreements on a case-by-case basis. *See Preston v. Marathon Oil Co.*, 2012 WY 66, ¶¶ 14–23, 277 P.3d 81, 86–88 (Wyo. 2012). We will not, here, determine that physician non-compete agreements are per se void as against public policy.

## IV. Did the Panel make a manifest error of law in violation of specific public policy arising from well-established legislative, judicial, or administrative mandate?

[¶33] Dr. Skaf claims the Panel based its analysis on a manifest error of law that violates public policy and that error corrupted all the arbitrators' conclusions. During the Panel's discussion on the enforcement of non-compete agreements, it declared: "Wyoming law *strongly supports covenants not to compete* and the enforcement of the same *permits public policy* to be served." (Emphasis added.) Dr. Skaf correctly points out that this statement is the antithesis to clear Wyoming law. In response, WCS argues that, in all other aspects of its decision, the Panel correctly followed the analysis in *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531 (Wyo. 1993), our seminal case on professional non-compete agreements. This issue has widespread public policy implications in great part because of its potential impact on all departing employees who are or may become subject to a non-compete agreement. This is especially true for those who choose not to litigate. *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 682–83 (1960).

## A. Standard of Review

[¶34] Our standard of review when asked to vacate an arbitration award is as follows:

> We review *de novo* a district court's decision to confirm, vacate, or modify an arbitration award. When reviewing the district court's order after an arbitration, we undertake a full review of the record without deference to the views of the trial court. At the same time, this Court, like the district court, shows substantial deference to the decision of the arbitrator.
>
> In reviewing the record below, we are mindful that the grounds for vacating or modifying an arbitrator's award remain narrow in scope. Because of its voluntary, informal

12

nature, awards made in arbitration are subject to less intensive scrutiny than are, for example, the orders of administrative agencies. The reviewing court must observe the principle that arbitrators are free to fashion forms of relief which could not be ordered by a court in law or equity. Furthermore, we are reluctant to disturb an arbitrator's just solution to a controversy, even if it differs from the resolution we might have chosen, had we been in the arbitrator's place. As a voluntary method for resolution of disputes, arbitration is embedded in the public policy of Wyoming and is favored by this court.

*Worman v. BP Am. Prod. Co.*, 2011 WY 54, ¶ 6, 248 P.3d 644, 646 (Wyo. 2011) (citations and internal quotation marks omitted); *Vogt v. MBNA Am. Bank*, 2008 WY 26, ¶ 11, 178 P.3d 405, 408–09 (Wyo. 2008) ("As a general rule, we are reluctant to upset the arbitrator's resolution of a controversy.").

## B.    Analysis

[¶35] Dr. Skaf maintains the Panel made a manifest error of law when it declared Wyoming's public policy strongly favors non-compete agreements and that enforcement of the same promotes public policy.

[¶36]  The relevant statutory grounds for vacating an arbitration award are:

> a)    Upon application of a party the court shall vacate an award where:
>
> (i)    The award was procured by corruption, fraud or other undue means;
>
> (ii)    There was evident partiality by an arbitrator appointed as a neutral, corruption of any of the arbitrators or misconduct prejudicing the rights of any party;
>
> (iii)    The arbitrators exceeded their powers . . . .

Wyo. Stat. Ann. § 1-36-114(a)(i)–(iii) (LexisNexis 2021) (emphasis added). In *JBC* we recognized that when considering a motion to vacate, the trial court is not limited to the grounds listed in the statute but may also vacate the award for "behavior beyond the bounds of natural justice . . . or a manifest mistake of fact or law appearing upon the face of the award." *JBC of Wyoming Corp. v. City of Cheyenne*, 843 P.2d 1190, 1194–95

13

(Wyo. 1992) (quoting *Texas W. Oil & Gas Corp. v. Fitzgerald*, 726 P.2d 1056, 1062 (Wyo. 1986), quoting *Riverton Valley Elec. Ass'n v. Pac. Power & Light Co.*, 391 P.2d 489, 500 (Wyo. 1964)).[5] The reason for applying manifest error is to protect the integrity of arbitration. *Roussos v. Roussos*, 275 Cal. Rptr. 3d 196, 201 (Ct. App. 2021) ("For arbitration to be effective there must be broad public confidence in the integrity and fairness of the process." (quoting Cal. R. Ct. RB Ethics Standard 1 (West 2003))). Even with these additional bases for vacating an arbitration award, the scope of judicial review of arbitration awards is very narrow. *Welty v. Brady*, 2005 WY 157, ¶ 11, 123 P.3d 920, 924 (Wyo. 2005). In Wyoming, manifest error is an additional, non-statutory ground for vacatur.[6] *See JBC*, 843 P.2d at 1194.

---

[5] In *Worman*, a case decided under the Federal Arbitration Act (FAA), we recognized that some federal authority has held that a manifest mistake of law is "no longer a valid basis for vacating an arbitration award under the Federal Arbitration Act." *Worman*, ¶ 10, 248 P.3d at 648. There, we were inclined to affirm the decision by the district court on that basis. However, "[g]iven th[e] uncertainty in the federal authority," and "in the interest of caution and full explanation," we proceeded to consider the merits of Mr. Worman's position. *Id.* ¶ 11, 248 P.3d at 648. Here, we are not construing the federal statute and the law as stated in *JBC* is our controlling authority.

[6] Manifest error is considered by some courts as a form of an arbitrator exceeding his powers under the statute. Such an act in excess of authorized power allows the court to vacate the arbitration decision. *See, e.g.*, *Nxegen, LLC v. Carbone*, 109 A.3d 534, 539 (Conn. App. Ct. 2015) ("[A]n award that manifests an egregious or patently irrational application of the law is an award that should be set aside . . . because the arbitrator has exceeded [his] powers . . . ." (quoting *Garrity v. McCaskey*, 612 A.2d 742, 747 (Conn. 1992))); *Digital Landscape Inc. v. Media Kings LLC*, 2018 COA 142, ¶ 82, 440 P.3d 1200, 1213 ("[O]ur review, like the district court's, is limited to deciding whether Digital has 'establish[ed] that the arbitrator exceeded the powers granted in the agreement by refusing to apply or ignoring the legal standard agreed upon by the parties for resolution of the dispute.'" (quoting *Giraldi By & Through Giraldi v. Morrell*, 892 P.2d 422, 424 (Colo. App. 1994))); *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 641 (9th Cir. 2010) (arbitrators "exceed their powers" when the award exhibits a "manifest disregard of law" (quoting *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 997 (9th Cir. 2003))); *Abbott v. L. Off. of Patrick J. Mulligan*, 440 F. App'x 612, 618–19 (10th Cir. 2011) (In the "Second, Sixth (in an unpublished decision) and Ninth Circuits, manifest disregard remains a viable standard because an arbitrator who manifestly disregards the law exceeds his powers under 9 U.S.C. § 10(a)(4)." (citing *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009) ("We have already determined that the manifest disregard ground for vacatur is shorthand for a statutory ground under the FAA, specifically 9 U.S.C. § 10(a)(4), which states that the court may vacate 'where the arbitrators exceeded their powers.'"))); *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 95 (2d Cir. 2008) ("[The Supreme Court in *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008)] did not, we think, abrogate the 'manifest disregard' doctrine altogether. . . . [P]arties do not agree in advance to submit to arbitration that is carried out in manifest disregard of the law."), *overruled on other grounds*, 559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010).

Other courts have declined to equate manifest error with exceeding authority because "manifest error" is not enumerated in the statute as a basis to vacate an arbitration award.

> [T]he Fifth, Eighth and Eleventh Circuits have concluded *Hall Street* left no room for the judicially created doctrine. *Frazier v. CitiFinancial Corp.*, 604 F.3d 1313, 1324 (11th Cir. 2010) ("We hold that our judicially-created bases for vacatur are no longer valid in light of *Hall*

[¶37] We have not explicitly stated what constitutes a manifest error or a manifest disregard of the law. In *Worman*, we reiterated the Tenth Circuit's standard for a "manifest disregard" of the law as a "willful [in]attentiveness to the governing law." *Worman*, ¶ 12, 248 P.3d at 648–49 (quoting *ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1463 (10th Cir. 1995)). Dr. Skaf cannot "rely on mere legal error" to vacate an arbitrator's award confirmed by the district court. *Id.* "An arbitrator's erroneous interpretations or applications of law are not reversible." *Id.* (quoting *ARW*, 45 F.3d at 1463). Dr. Skaf must show clear and convincing evidence that the award "was obtained by . . . excess of authority, or a manifest mistake of fact or law appearing upon the face of the award . . . ." *Matter of Town of Greybull*, 560 P.2d 1172, 1175 (Wyo. 1977) (quoting *Riverton*, 391 P.2d at 500). "Clear and convincing evidence is the 'kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.'" *Alexander v. Meduna*, 2002 WY 83, ¶ 29, 47 P.3d 206, 216 (Wyo. 2002) (quoting *MacGuire v. Harriscope Broad. Co.*, 612 P.2d 830, 839 (Wyo. 1980)).

[¶38] Courts addressing "manifest disregard" or "manifest error" of law have established similar tests to determine whether a manifest error is found on the face of an arbitration award. In *Garrity*, the Connecticut Supreme Court adopted a three-element test and require each element to be satisfied before vacating an arbitration award on the grounds of manifest disregard of the law:

> [(1)] The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. [(2) T]he arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. [(3)] The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable.

> *Street*. In so holding, we agree with the Fifth Circuit that the categorical language of *Hall Street* compels such a conclusion."); *Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009) ("*Hall Street* unequivocally held that the statutory grounds are the exclusive means for vacatur under the FAA. Our case law defines manifest disregard of the law as a *nonstatutory* ground for vacatur. Thus, to the extent that manifest disregard of the law constitutes a nonstatutory ground for vacatur, it is no longer a basis for vacating awards under the FAA.") (citation omitted); *Medicine Shoppe Int'l, Inc. v. Turner*, 614 F.3d 485, 489 (8th Cir. 2010) ("Appellants' claims, including the claim that the arbitrator disregarded the law, are not included among those specifically enumerated in § 10 and are therefore not cognizable.").

*Abbott*, 440 F. App'x at 618–20.

*Garrity v. McCaskey*, 612 A.2d 742, 747 (Conn. 1992); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933–34 (2d Cir. 1986).  New York applies a similar test: "For there to be a manifest disregard, not only must the arbitrator know the law and then disregard it altogether, but the law disregarded must be well defined, explicit and clearly applicable to the case."  *Fellus v. A.B. Watley, Inc.*, No. 117890/04, 2005 WL 975690, at *4 (Sup. Ct. Apr. 15, 2005) (citing *Banc of Am. Sec. v. Knight*, 781 N.Y.S.2d 829, 836 (Sup. Ct. 2004), *abrogated by Morgan Stanley DW Inc. v. Afridi*, 788 N.Y.S.2d 11 (App. Div. Dec. 21, 2004); *accord*, *Sawtelle v. Waddell & Reed, Inc.*, 754 N.Y.S.2d 264 (App. Div. 2003); *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir. 1998)).  "Knowledge of the operative legal principle and its proper application can be inferred only if the court finds an error that is so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator."  *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750–51 (Del. 2014) (internal citations and quotation marks omitted).  We adopt the test for manifest error of law as articulated in these cases and apply it here.

[¶39]  The manifest error claimed here alleges a violation of public policy.  Wyoming's public policy regarding covenants not to compete is explicit, well-defined, and dominant.

> "Two principles, the freedom to contract and the freedom to work, conflict when courts test the enforceability of covenants not to compete."  *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 539 (Wyo. 1993).  Over half a century ago, we stated "sound public policy encourages employees to seek better jobs from other employers or to go into business for themselves."  *Ridley v. Krout*, 63 Wyo. 252, [265,] 180 P.2d 124, 127 (1947) (citations and quotation marks omitted).  Contracts which hinder them from doing so are "strictly construed and rigidly scanned and are declared void unless necessary for the reasonable protection of the employer."  *Id.* (citations and quotation marks omitted).  *See also*, *Hopper*, 861 P.2d at 539 (a non-compete agreement restrains trade, and the common law policy against contracts in restraint of trade is firmly established (citing Restatement (Second) of Contracts §§ 185–188 (1981) (Introductory Note at 35) and *Dutch Maid Bakeries v. Schleicher*, 58 Wyo. 374, 131 P.2d 630, 634 (1942))).  A non-compete provision "is prima facie invalid, and . . . to establish its validity it is incumbent on the [employer] to prove that there existed some special circumstances which rendered it reasonably necessary for the protection of the [employer's] business."  *Ridley*, 180 P.2d at 129 (citation and some quotation marks omitted).  An agreement not to compete is valid and enforceable only if it

16

is: "(1) in writing; (2) part of a contract of employment; (3) based on reasonable consideration; (4) reasonable in duration and geographical limitations; and (5) not against public policy." *Hopper*, 861 P.2d at 540.

*Brown v. Best Home Health & Hospice, LLC*, 2021 WY 83, ¶ 10, 491 P.3d 1021, 1027 (Wyo. 2021); *see also Preston*, ¶ 15, 277 P.3d at 86 (public policy generally disfavors employee non-compete agreements). Our public policy is clear—covenants not to compete are prima facie invalid unless necessary for the reasonable protection of the employer.

[¶40] The parties agreed the arbitration would be governed by Wyoming law. We may infer the Panel knew Wyoming's clear public policy against restraint of trade because its decision relied on *Hopper*, which unambiguously states: "The common law policy *against* contracts in restraint of trade is one of the oldest and most firmly established. Restatement (Second) of Contracts §§ 185–188 (1981) (Introductory Note at 35). *See Dutch Maid Bakeries v. Schleicher*, 58 Wyo. 374, 131 P.2d 630, 634 (1942)." *Hopper*, 861 P.2d at 539 (emphasis added). Nonetheless, the Panel determined it would apply a public policy—in contravention of *Hopper*—that "strongly favors" non-compete agreements and their enforcement.

[¶41] Here, we are presented with a unique situation—the Panel's manifest error—its application of a nonexistent public policy directed the Panel's review of the contract in a manner not authorized by law. While the Panel considered whether the covenant was "reasonable . . . and [was] necessary for" the protection of WCS and its business interests, as required by *Hopper*, 861 P.2d at 539, and considered potential injury to the public, *see Brown*, ¶¶ 24–25, 491 P.3d at 1030, its starting point—an antithetical public policy—resulted in the Panel ignoring the parties' contractual intent and rewriting the agreement from its own perspective.

[¶42] Covenants are interpreted in accordance with principles of contract law. *Pennaco Energy, Inc. v. KD Co. LLC*, 2015 WY 152, ¶ 25, 363 P.3d 18, 25 (Wyo. 2015). It is well-established that "[C]ourts are not at liberty to rescue parties from the consequences of their unwisely made bargains and we cannot rewrite the contract under the guise of judicial construction." *P & N Invs., LLC v. Frontier Mall Assocs., LP*, 2017 WY 62, ¶ 22, 395 P.3d 1101, 1107 (Wyo. 2017) (quoting *Hunter v. Reece*, 2011 WY 97, ¶ 23, 253 P.3d 497, 503 (Wyo. 2011)). We have said: "[W]e will construe contract language 'in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made.'" *Pope v. Rosenberg*, 2015 WY 142, ¶ 20, 361 P.3d 824, 830 (Wyo. 2015) (quoting *Wallop Canyon Ranch, LLC v. Goodwyn*, 2015 WY 81, ¶ 35, 351 P.3d 943, 952–53 (Wyo. 2015)). "[W]e will not 'rewrite contracts under the guise of interpretation, and so long as there is no ambiguity, we are bound to apply

contracts as they have been scrivened.'" *Pope*, ¶ 20, 361 P.3d at 830 (quoting *Wallop*, ¶ 35, 351 P.3d at 952–53). Because "[the] primary purpose is to determine the true intent and understanding of the parties at the time and place the agreement was made[,]" the process "begin[s] by considering *de novo* the plain language of the agreements." *Pennaco*, ¶ 25, 363 P.3d at 25.

[¶43]   We reiterate the language of the Agreement.

> 11.1 <u>Covenant Not to Compete</u>.  As an essential part of this Agreement, Employee covenants with Employer that if Employee's employment with Employer terminates for any reason, Employee **will not practice medicine** for a period of two years following termination of employment **within a 100-mile radius of Casper, Wyoming, and each outreach clinic of Employer**.  This covenant will apply to Employee whether he engages in the subsequent practice of medicine in an individual capacity, as an employee of another concern, or as a principal of a partnership, corporation, or other entity. **Notwithstanding the foregoing, this provision is not intended to, nor will it be construed as, limiting in any way Employee's right to have hospital privileges or to perform medical procedures at Wyoming Medical Center, Casper, Wyoming.**

(Emphasis added.)  Driven by its premise that Wyoming "strongly favors" non-compete agreements and their enforcement, the Panel determined it was "obligated," under *Hopper*, "to enforce the reasonable restriction contained in the covenant and eliminate or modify an unreasonable restriction."  The Panel then proceeded to rewrite the contract. First it changed the provision requiring Dr. Skaf to "not *practice medicine* for a period of two years," to one prohibiting only the practice of "cardiology."  The Panel incorporated this significant modification into its decision without discussion.  Next, the Panel redrafted the geographic scope of the Agreement.  It redefined and reduced the geographic boundaries, replacing the 100-mile radius as it applied to outreach clinics with county boundaries.  It selectively removed certain communities from the restriction including Cheyenne, Sheridan, and Gillette.  The Panel recast the provision addressing Dr. Skaf's right to medical privileges at the Wyoming Medical Center.  It rejected the interpretation offered by Dr. Skaf and the one offered by WCS, substituting its own view. At issue was whether Dr. Skaf must maintain an office in Casper to avail himself of his Wyoming Medical Center privileges.  The Panel determined that the Wyoming Medical Center's rules and regulations did not "require" Dr. Skaf's office.  It then interpreted and revised the provision to read:

18

> Dr. Skaf may not engage in competitive cardiopulmonary healthcare services outside of the Wyoming Medical Center except to any limited extent he is *required* to provide specific services or facilities as a *specific condition* of maintaining his privileges at Wyoming Medical Center.

As to what would be "*required*," the Panel deferred to the Wyoming Medical Center to interpret its own rules and regulations. In the end, the only unchanged limitation in the covenant was its two-year duration.

[¶44] In *Hopper*, this Court accepted the principle that a trial court or arbitrator may, in a proper case, modify a restrictive covenant. The different approaches to equitable reformation of non-compete covenants were described by the First Circuit as follows:

> Courts presented with restrictive covenants containing unenforceable provisions have taken three approaches: (1) the "all or nothing" approach, which would void the restrictive covenant entirely if any part is unenforceable, (2) the "blue pencil" approach, which enables the court to enforce the reasonable terms provided the covenant remains grammatically coherent once its unreasonable provisions are excised, and (3) the "partial enforcement" approach, which reforms and enforces the restrictive covenant *to the extent it is reasonable*, unless the "circumstances indicate bad faith or deliberate overreaching" on the part of the employer.

*Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463, 1469 (1st Cir. 1992) (quoting *Durapin, Inc. v. Am. Prods., Inc.*, 559 A.2d 1051, 1058 (R.I. 1989)). In *Hopper*, we adopted the third approach, partial enforcement as described in *Reddy v. Cmty. Health Found. of Man*, 298 S.E.2d 906, 915 (W.Va. 1982), when construing covenants not to compete. *Hopper*, 861 P.2d at 547. While the three approaches differ in some respects, none of them allow the court or arbitrator to rewrite a contract to create a new agreement for the parties in order to uphold a non-compete covenant.

[¶45] The threshold analysis as laid out by the *Reddy* Court is:

> even when contracts are deemed valid and binding, courts should still approach restrictive covenants with grave reservations, and take a strict view of them on first impression. The covenant in question must be reasonable on its face if judicial scrutiny of it is to continue. . . . No court should trouble itself to rewrite an inherently unreasonable covenant to bring the covenant within the rule of reason.

*Reddy*, 298 S.E.2d at 915. A covenant so lacking in the essential terms which would protect the employee is unenforceable if the trial court or arbitrator must supply restrictions to make it reasonable.

[¶46] While Arizona applies the more restrictive blue pencil approach and not the rule of reason to unenforceable provisions of restrictive covenants,[7] the Arizona Supreme Court's decision in *Valley Med. Specialists* is instructive. In *Valley Med. Specialists*, the covenant not to compete restricted the defendant, Dr. Farber, from providing "medical care or medical assistance for any person or persons who were patients o[f] Employer during the period that Employee was in the hire of Employer." *Valley Med. Specialists v. Farber*, ¶ 30, 982 P.2d 1277, 1285–86 (Ariz. 1999). The court of appeals limited the restriction to treatment of HIV-positive and AIDS patients or performing brachytherapy. *Id.* The Arizona Supreme Court found that this modification "in essence, rewrote the agreement in an attempt to make it enforceable." *Id.* The court reversed, stating, "This goes too far . . . , the court cannot create a new agreement for the parties to uphold the contract." *Id.* (quoting *Olliver/Pilcher Ins., Inc., v. Daniels*, 715 P.2d 1218, 1221 (Ariz. 1986)); *see also Ins. Ctr., Inc. v. Taylor*, 499 P.2d 1252, 1256 (Idaho 1972); *Buttie v. Norfolk & Dedham Mut. Fire Ins. Co.*, 995 A.2d 546, 550 (R.I. 2010) ("We have stated specifically that, although arbitrators have 'the power and the authority to interpret [a] contract . . . they [do] not have the power and authority to rewrite it.'" (quoting *Town of Coventry v. Turco*, 574 A.2d 143, 147 (R.I. 1990))).

[¶47] Here the Panel began with a manifest error—a public policy in direct contravention of clear Wyoming law which controlled the course of the arbitration. This error led the Panel to rewrite three of four restrictions in the covenant resulting in wholesale contract revision—another manifest error of law.

[¶48] Parties do not contract for the resolution of their dispute to be based on a manifest error of the law they have chosen to govern the result. An award based on a manifestly erroneous premise would place the power of the courts behind arbitral awards that flaunt the law. The Panel made a manifest error of law when it ignored a specific public policy arising from well-established judicial mandate—covenants not to compete are prima facie

---

[7] The Arizona Supreme Court said:

> Arizona courts will "blue pencil" restrictive covenants, eliminating grammatically severable, unreasonable provisions. *See Amex Distrib. Co.* [*v. Mascari,*] 150 Ariz. [510] at 514, 724 P.2d [596, 600 (Ariz. Ct. App. 1986)]; *Olliver/Pilcher Ins.*[*, Inc. v. Daniels*], 148 Ariz. [530] at 533, 715 P.2d [1218, 1221 (Ariz. 1986)] ("If it is clear from its terms that a contract was intended to be severable, the court can enforce the lawful part and ignore the unlawful part.").

*Valley Med. Specialists v. Farber*, ¶ 30, 982 P.2d 1277, 1286 (Ariz. 1999).

invalid unless necessary for the reasonable protection of the employer; that error led the Panel to rewrite the parties' contract.

[¶49]  "A court shall vacate an award if it determines '. . . the award cannot be corrected without affecting the merits of the decision upon the controversy submitted.'" *Jordan v. California Dep't of Motor Vehicles*, 123 Cal. Rptr. 2d 122, 131 (Ct. App. 2002), *as modified on denial of reh'g* (Aug. 20, 2002) (quoting Cal. Civ. Proc. Code § 1286.2 (West 2002)).  We cannot correct the Panel's error.  We therefore reverse the district court's confirmation and vacate the award.

## *CONCLUSION*

[¶50]  WCS' motions to dismiss this appeal are denied.  Restrictive covenants between physicians are not unenforceable as a matter of public policy.  Dr. Skaf established by clear and convincing evidence that the Panel made a manifest error of law in violation of specific, well-established public policy in its review and wholesale revision of the covenant not to compete.  We reverse the order confirming the award, vacate the award, and remand to the district court.

**DAVIS, Justice, specially concurring, in which KAUTZ, J., joins.**

[¶51] I concur in the majority opinion, which correctly limits the extent to which the blue pencil rule may be used to reform an overly broad non-compete agreement. I write separately because I believe the blue pencil rule is antithetical to our principles of contract enforcement and our recognized goals of fair competition and certainty in business. The majority opinion is an appropriate resolution given the narrow standard of review we apply to arbitration awards, but in an appropriate case, I would go farther than the majority opinion and eliminate the rule.

[¶52] As the majority opinion recognizes, a non-compete agreement is enforceable only if it is reasonably drawn to protect an employer's business interest. *See Brown v. Best Home Health & Hospice, LLC*, 2021 WY 83, ¶ 10, 491 P.3d 1021, 1027 (Wyo. 2021). If the restrictions in the non-compete agreement are unreasonable, the agreement violates public policy and is invalid. *Id*.

[¶53] This Court has long held that "a contract which is contrary to public policy will not be recognized by the court, and the parties to the contract will be left as the court finds them." *Retz v. Siebrandt*, 2008 WY 44, ¶ 16, 181 P.3d 84, 90 (Wyo. 2008) (quoting *Tate v. Mountain States Tel. & Tel. Co.*, 647 P.2d 58, 61 (Wyo. 1982)); *see also Hamburg v. Hansen*, 683 P.2d 662, 663 (Wyo. 1984). We have also held that "[c]ourts are not at liberty to rescue parties from the consequences of a poorly made bargain or a poorly drafted agreement by rewriting a contract under the guise of construing it." *Four B Props., LLC v. Nature Conservancy*, 2020 WY 24, ¶ 56, 458 P.3d 832, 846 (Wyo. 2020) (quoting *In re CDR*, 2015 WY 79, ¶ 30, 351 P.3d 264, 270-71 (Wyo. 2015)); *see also Matter of Frederick's Estate*, 599 P.2d 550, 556 (Wyo. 1979) ("[A]fter competent parties have solemnly contracted and agreed to certain conditions, courts should exercise restraint in nullifying the terms thereof or rewriting the contract.") (quoting *Younglove v. Graham & Hill*, 526 P.2d 689, 692 (Wyo. 1974)).

[¶54] I believe our Court departed from these principles when it adopted the blue pencil rule, which allows a court or arbitrator to narrow a covenant's restrictions to make them enforceable. *See Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 545-46 (Wyo. 1993).[8] As justification for this departure, the Court reasoned:

---

[8] The Court adopted what is known as the liberal version of the blue pencil rule, which within certain confines "permit[s] a court to rewrite an overbroad non-competition agreement to reasonably limit the restrictions found in the agreement." Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument For Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 682 (2008); *see also Brown*, ¶ 24 n.5, 491 P.3d at 1030 n.5 ("If a non-compete agreement is overly broad, the court may use the 'blue pencil rule' to limit it to a reasonable term and area.") (citing *Hopper*, 861 P.2d at 545-46).

22

We believe the ability to narrow the term of a covenant not to compete and enforce a reasonable restraint permits public policy to be served in the most effective manner. Businesses function through the efforts of dedicated employees who provide the services and build the products desired by customers. Both the employer and the employee invest in success by expressing a commitment to one another in the form of a reasonable covenant not to compete. For the employer, this commitment may mean providing the employee with access to trade secrets, customer contacts or special training. These assets of the business are entitled to protection. For the employee, who covenants as part of a bargained for exchange, the covenant provides notice of the limits both parties have accepted in their relationship. The employee benefits during his tenure with the employer by his or her greater importance to the organization as a result of the exposure to the trade secrets, customer contacts or special training. When the employer-employee relationship terminates, a reasonable covenant not to compete then avoids unfair competition by the employee against the former employer and the specter, which no court would enforce, of specific performance of the employment agreement. When the parties agree to terms of a covenant, one of which is too broad, the court is permitted to enforce a narrower term which effectuates these public policy goals without arbitrarily invalidating the entire agreement between the parties and creating an uncertain business environment. In those instances where a truly unreasonable covenant operates as a restraint of trade, it will not be enforced.

*Hopper*, 861 P.2d at 546-47.

[¶55]  I appreciate the policy objectives of avoiding unfair competition and an uncertain business environment, but I do not believe that the blue pencil rule is the way to achieve them.  In fact, I believe it has the opposite effect.  It creates an incentive to draft overly broad covenants not to compete in order to instill fear in employees, who can only show that a covenant is overly broad after litigation, the outcome of which is far from certain and can be too costly to pursue.  Because an employer can rely on a court or arbitrator to narrow any overly broad restriction, there are no consequences for overreaching in drafting the covenant, which the employee agrees to at a time when the bargaining positions of the parties are usually unequal.  One commentator aptly summarized the argument against the rule as follows:

23

> For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors. Thus, the mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable. This smacks of having one's employee's cake, and eating it too.

Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 682-83 (1960); *see also Golden Rd. Motor Inn, Inc. v. Islam*, 376 P.3d 151, 158 (Nev. 2016) ("[I]t is plain that the scales are most imbalanced when the party who holds a superior bargaining position, and who is the contract drafter, drafts a contract that is greater than required for its protection and is thereafter rewarded with the court's legal drafting aid, as the other party faces economic impairment, restrained in his trade."); *Kolani v. Gluska*, 75 Cal.Rptr.2d 257, 260 (Cal. Ct. App. 1998) ("Employers would have no disincentive to use the broad, illegal clauses if permitted to retreat to a narrow, lawful construction in the event of litigation."); *Streiff v. Am. Family Mut. Ins. Co.*, 348 N.W.2d 505, 509 (Wis. 1984) (noting legislative concern that blue pencil rule encourages employers with superior bargaining power "to insist upon unreasonable and excessive restrictions, secure in the knowledge that the promise will be upheld in part, if not in full."); *Reddy v. Cmty. Health Found. of Man*, 298 S.E.2d 906, 914-15 (W. Va. 1982) ("[T]he willingness of any court to allow the employer to enforce only the reasonable terms of an agreement not to compete, or to apply the 'blue-pencil' doctrine, severing the unreasonable terms and enforcing the remainder, will necessarily encourage employers to draft overly broad agreements in the belief that most employees will not challenge the agreement, and that if they do, the terms will simply be judicially narrowed."); Pivateau, *supra*, at 690 ("By providing an eventual remedy of sorts, the blue pencil doctrine increases the use of overly broad clauses."); Kenneth R. Swift, *Void Agreements, Knocked–Out Terms, and Blue Pencils: Judicial and Legislative Handling of Unreasonable Terms in Noncompete Agreements*, 24 Hofstra Lab. & Emp. L.J. 223, 246 (2007) (noting that jurisdictions that reject the blue pencil rule intend to encourage careful drafting devoid of "overreaching terms for fear that the entire agreement will be voided.").

[¶56] Our law puts the onus on an employer to justify the need for a non-compete covenant. *Brown*, ¶ 10, 491 P.3d at 1027; *Hopper*, 861 P.2d at 539. I see no reason to not also task the employer with the careful drafting of any non-compete provision it seeks to impose. This would encourage narrowly crafted agreements tailored to the employer's

specific needs, alleviate unfairness to employees who are often in an inferior bargaining position when presented with a covenant, and relieve our courts, and arbitrators, of the unnatural task of rewriting parties' contracts. *See Golden Rd.*, 376 P.3d at 158 (rejecting blue pencil rule "is consistent with basic principles of contract law that hold the drafter to a higher standard"); *Unlimited Opportunity, Inc. v. Waadah*, 861 N.W.2d 437, 441 (Neb. 2015) ("This court has long held that it is not the function of the courts to reform a covenant not to compete in order to make it enforceable."); *Prod. Action Int'l, Inc. v. Mero*, 277 F.Supp.2d 919, 932 (S.D. Ind. 2003) ("[T]he courts need not do for the employer what it should have done in the first place—write a reasonable covenant."); Pivateau, *supra*, at 693 ("The blue pencil doctrine deprives the court and the parties of the touchstone to contract construction: the actual, written agreement between the parties.").

[¶57] Eliminating the blue pencil rule would not eliminate all litigation concerning the scope of covenants not to compete. However, it would hopefully result in a more defined and stable body of case law, and a situation in which the employer cannot hope that the courts, or an arbitrator, will rescue it from overreaching by rewriting the agreement.

[¶58] For these reasons, I would overrule *Hopper's* adoption of the blue pencil rule and return to our rules of restraint that preclude us from changing contract terms that the parties have negotiated and wisely or unwisely agreed upon.